TIME INSURANCE COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3075-80. Filed March 10, 1986.

---

*Thomas J. Donnelly* and *Peter C. Karegeannes,* for the petitioner.

*Seymour I. Sherman* and *Edward J. Roepsch,* for the respondent.

SHIELDS, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1972 | $1,935,682.54 |
| 1973 | 397,760.23 |
| 1974 | 193,267.27 |
| 1975 | 483,091.21 |

After a number of concessions, the issues remaining are: (1) Whether petitioner properly computed its claim reserves on certain accident and health policies during the years in issue; (2) whether respondent's disallowance of a portion of petitioner's deductions for claim reserves was so arbitrary and unreasonable as to shift the burden of going forward with the evidence with respect to the correct amount of the reserves to respondent; and (3) if the deduction for claim reserves in 1972 is found to be improper, whether petitioner is entitled to spread forward any adjustment for that year over the 10-year period provided by section 810(d).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found. Their stipulation of settled issues, stipulation of facts, and supplemental stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

Petitioner is Time Insurance Co. (Time). It is a stock life insurance company which was organized in 1910 under the

---

[1] All section references are to the Internal Revenue Code of 1954 as amended during the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.

laws of Wisconsin, and during all relevant times had its principal office and place of business in Milwaukee. For each of the calendar years 1972 through 1975, Time filed with the Internal Revenue Service Center at Kansas City, Missouri, original, amended, and "corrected amended" income tax returns as a life insurance company taxable under sections 801 through 820. Each return consisted of a Form 1120L, attached supporting schedules, and a copy of Time's annual statement for the particular year on a form prescribed by the National Association of Insurance Commissioners (NAIC).

During the years under consideration, petitioner as a life insurance company was required by State law to file the NAIC annual statements on a calendar year basis with the insurance regulatory agency of each State in which it did business. It was also required to file copies of such statements with and as part of its Federal income tax returns. The form for and the information required by the annual statements are prescribed by the NAIC, an organization of which the insurance commissioner, or other principal insurance executive, of every State is a member.

During 1972 through 1975, petitioner sold life insurance and accident and health insurance in 45 States, including Wisconsin. Its accident and health (A & H) policies included both disability income and medical reimbursement insurance. The dispute in this case is limited, however, to the A & H medical reimbursement policies, which in the industry are sometimes referred to as medical expense policies. This type of policy insures against certain specified financial losses suffered by the insured as a result of an injury or sickness. Such policies generally provide for payment by the insurance company, either directly or through reimbursement to the insured, of all or part of the insured's covered medical expenses.[2]

*A & H Reimbursement Policies - Generally*

For purposes of administering benefit claims and establishing claim reserves, petitioner, during the years under

---

[2] The term "insured" as used herein means the policyholder under an individual policy, the participant or member under a group policy, and all covered dependents of such persons.

consideration, divided its A & H medical reimbursement policies into the following categories:

(1) Individual Guaranteed Renewable (GR) hospital/surgical (class 6);

(2) Individual Guaranteed Renewable (GR) major medical (class 7);

(3) Individual Optionally Renewable (OR) hospital/surgical (class G);

(4) Individual Optionally Renewable (OR) major medical (class H);

(5) Group policies.[3]

Petitioner's GR policies were renewable by the insured at a premium based upon the insured's age at original entry. Its OR policies were similar to GR policies except that they were renewable at the option of petitioner, not the insured, but petitioner never refused to renew such policies.[4] Group policies remained in continuous effect so long as the premiums were paid, but either the group holder or petitioner could terminate the policy at the end of any policy year by giving 30 days written notice prior to the yearend.

All of petitioner's reimbursement policies were of a "per cause" type as opposed to a "calendar year" type in that they provided benefits after the satisfaction of a deductible amount during the specified benefit periods (usually 2 or 3 years) arising from a *particular* claim event or cause, i.e., injury or sickness. However, with only slight variations not relevant here, each of petitioner's policies contained the following provision:

TIME * * * does hereby insure * * * and agrees to pay the Insured for Covered Expenses * * * *incurred while this policy is in force*, resulting from injury or sickness * * * in the manner and to the extent herein provided. [Emphasis added.]

Each policy also contained a grace period of 30 or 31 days for premium payments which was typically set out as follows:

A grace period of thirty-one days will be granted for the payment of each

---

[3]The group policies included both hospital/surgical and major medical benefits, but the benefits were not separated into different classes of business.

[4]No question has been raised as to whether or not this type of policy qualifies as a noncancelable health and accident insurance contract under sec. 801(b) or (e).

premium falling due after the first premium, *during which grace period the policy shall continue in force*. [Emphasis added.]

In the OR policies, the grace period did not apply if petitioner had given written notice of its intention not to renew the policy 30 days prior to the premium due date. However, such refusal to renew or any other cancellation or termination would be without prejudice to any claim arising while the policy was in force.

## Hospital/Surgical Policies - GR and OR

In a typical GR hospital/surgical policy (Class 6), petitioner agreed to pay a percentage (usually 80 percent) of the first $2,000 of covered medical expenses and another percentage (usually 100 percent) of such expenses thereafter, up to a lifetime maximum aggregate. The covered expenses were also subject to a maximum daily benefit set out in a policy schedule. Under these policies, reoccurring hospitalizations or surgical procedures caused by the same injury or sickness and separated by less than 90 days in some policies, and 180 days in other policies, were considered to be part of the same injury or sickness.

A typical OR hospital/surgical policy (Class G), contained a deductible amount, a maximum daily reimbursement for hospital confinement, and a maximum hospital miscellaneous expense benefit for each separate injury or sickness. Petitioner also agreed to pay surgical expenses, up to a maximum amount, for each injury or sickness based on a schedule of surgical benefits. Successive surgical procedures for the same cause were treated as the same procedure when they were separated by less than 12 months.

## Major Medical Policies - GR and OR

In a typical GR major medical policy (Class 7), petitioner agreed to reimburse the insured for covered expenses incurred with respect to each separate injury or sickness, over a deductible amount, during a specified benefit period. The reimbursement was subject to a maximum amount set out in a policy schedule. The benefit period was usually 2 or 3 years and began when the first eligible expense occurred that satisfied the policy's deductible amount. Expenses

from a new cause had to satisfy a separate deductible amount before a benefit period for that cause was established.

Petitioner's OR major medical policies (Class H) were similar to its GR major medical policies in all material respects, except that the option to renew was with petitioner.

*Group Policies - Generally*

In a typical group policy petitioner agreed to pay hospital, miscellaneous, and other medical expenses, which exceeded a deductible amount, during a benefit period which usually lasted 2 years. The benefit period began on the date the policyholder incurred the first eligible expense which satisfied the policy's deductible amount. The payments were to be made in accordance with a benefit schedule and were not to exceed a maximum amount specified in the policy. Medical expenses for a separate injury or sickness were subject to a separate deductible amount and a separate benefit period.

Group policies typically contained the following additional provision:

EXTENSION OF BENEFITS: If the insurance of any Insured Member or dependent terminates because the insured leaves his employment, or ceases to be a member of the Group Holder while benefits are being paid hereunder, coverage will be continued as long as the covered person is continuously and totally disabled from the injury, sickness, or complication of pregnancy causing such disability; but only for: (1) a period of ninety (90) days, or (2) until the covered person is no longer totally disabled whichever occurs earlier; subject to the provisions of the Master Policy.

As required by State law, petitioner's group policies also provided extended maternity benefits where pregnancy commenced during the policy period.

Under Wisconsin's Administrative Code sec. Ins. 6.51 (1976), the following extended benefit provisions were also made applicable to petitioner's group insurance:

(6) EXTENSION OF BENEFITS. (a) Every group policy * * * must provide a reasonable provision for extension of benefits in the event of total disability at the date of discontinuance of the group policy or

contract during the continuance of total disability as required by the following paragraphs of this section. * * *

(d) In the case of hospital or medical expense coverages other than dental and maternity expense, a reasonable extension of benefits or accrued liability provision is required. Such a provision will be considered reasonable if it provides an extension of at least 12 months under major medical and comprehensive medical type coverages, and under other types of hospital or medical expense coverages provides either an extension of at least 90 days or an accrued liability for expenses incurred during a period of disability or during a period of at least 90 days *starting with a specific event which occurred while coverage was in force (e.g., an accident)*. [Emphasis added].

In making a determination of whether a particular claim for benefits would be accepted or denied, as well as the extent of petitioner's liability for such a claim, petitioner relied upon all of the terms and conditions appearing in the applicable policy and law, including some or all of the provisions set forth above. Under its practice, benefits would normally be denied by petitioner if the covered expenses were incurred while the policy was *not* in force notwithstanding that the policy was in force when: (1) The claim event or cause, i.e., injury or sickness, arose and (2) the first expense was incurred that satisfied the policy's deductible amount.

On a claim-by-claim basis, petitioner sometimes determined that it was liable for a limited amount of expense even though incurred while a policy was not in force. For instance, with respect to individual policies which are optionally renewable, the liability of an insurance company under such policies does not usually exist beyond the specified term if the company refuses to renew the policy for an additional term or terms. However, petitioner's OR policies provided that a refusal to renew would be without prejudice to any claim originating while the policy was in force. Moreover, petitioner followed the practice of never refusing to renew a policy under such circumstances.

With respect to group policies, petitioner was obligated by State law, as quoted above, to provide for certain benefits which extended beyond the policy period in cases where an individual left a covered group or a group policy was terminated. Petitioner also had extended liability dur-

ing a grace period for a premium payment provided the premium was actually paid during such grace period.

## Incurred Dates

To administer benefit claims, develop claim reserves, and determine the proper commencement date of benefit periods, petitioner assigned a loss "incurred date" to each claim made under its A & H policies. The assignment of incurred dates in this manner permitted claims for all reimbursable expenses arising out of the same claim event, i.e., injury or sickness, to be grouped together because the same loss-incurred date was given to all claims made during the benefit period which were attributable to the same cause. Furthermore, the same incurred date was assigned to a recurring surgical procedure or hospitalization if it related to the same cause and was not separated by more than the 90 days, the 180 days, or the 12 months provided by the particular policy involved.

The incurred date generally assigned by petitioner to a benefit claim was the date on which the policyholder became liable for the first expense which satisfied the policy's deductible amount for the particular event out of which the claim arose. However, if expenses were still being incurred by an insured with respect to an event when the benefit period expired, it was petitioner's general practice to assign a new incurred date, commence a new benefit period, and impose a new deductible amount.

## Petitioner's Method of Establishing Reserves

Petitioner was subject to regulation by the Department of Insurance of Wisconsin and a similar department in every other State in which it did business. During the years under consideration each State in which it did business required petitioner to place an actuarially sound value on its liability at yearend under its outstanding medical reimbursement A & H policies for the purpose of determining claim reserves. When making such reserve determinations, petitioner's actuarial judgment was subject to the professional standards of the insurance industry, as well as the regulations of the various States in which it did business.

The law regulating claim reserves in Wisconsin appears in the Wisconsin Administrative Code at sec. Ins. 3.17(5). This section provides that the reserve for claim liabilities on all A & H medical reimbursement policies shall be based upon the insurance company's own experience with such policies or other assumptions designed to place a sound value on its liabilities; that the reserve results shall be verified by the development of the company's actual claims over a period of years; and that in computing the reserve the insurer may employ suitable approximations, estimates, groupings, and averages.[5]

Using the above guidelines petitioner determined claim reserve amounts for its medical reimbursement policies for each of the years 1972 through 1975. The claim reserve amounts were reported by petitioner on its NAIC statements (Exhibits 9 and 11) to the insurance departments of Wisconsin and the other States in which it did business as well as to respondent. The annual NAIC statements were audited every 3 years for the purpose of determining the solvency of the company and its ability to pay claims. At all times here pertinent, the audits were conducted by Wisconsin's Department of Insurance with the participation of examiners from one or more other States. The results of such audits were filed with and accepted by all the States in which petitioner did business.

---

[5]Sec. Ins. 3.17(5) of the Wis. Admin. Code provides in part as follows:

(5) Claim Liability Reserves, Individual and Franchise. Claim liability reserves to represent the value of amounts not yet due on claims are required for all policies issued subject to subsection 201.04(4) of Ins. 6.70, section 600.03 (34m) (d), or 632.94, Wis. Stats.

(a) The minimum reserve for claim liabilities shall be computed employing the following assumptions:

$$*\qquad*\qquad*\qquad*\qquad*\qquad*\qquad*$$

a. Disability due to accident and sickness:* * *

b. All other benefits: The reserve shall be based on the individual company's experience or other assumptions designed to place a sound value on the liabilities. The results shall be verified by the development of each year's claims over a period of years.

(b) Insurers may employ suitable approximations and estimates, including but not limited to groupings and averages, in computing claim liability reserves.

(c) For policies with an elimination period, the duration of disablement should be considered as dating from the time that benefits would have begun to accrue had there been no elimination period.

(d) A new disability connected directly or indirectly with a previous disability which had a duration of at least one year and terminated within 6 months of the new disability should be considered a continuation of the previous disability.

*Petitioner's Reporting of Claim Reserves by the Claim Lag Method*

In determining its medical reimbursement claim reserves during the relevant years, petitioner employed an actuarial method known as the claim lag method.[6] In the insurance industry this is a common and accepted method for such determinations and is required under applicable Wisconsin law. Generally speaking, under this method, reserves for claims outstanding on a given date are determined by a projection of the company's past experience with the payment of similar claims. The method is based upon, and derives its name from, the estimated lapse of time based upon past experience, i.e., the time lag, between the incurred date assigned to a claim and the actual date or dates upon which the claim will be paid.

Under the applicable NAIC instructions, the total amount of petitioner's claim reserves at December 31 of each of the years in issue, was to be determined by computing and multiplying its reserve factor at that date by its reserve base. The reserve base at December 31 was the total amount which had been paid on all claims outstanding at that date. The reserve factor was determined from an analysis of petitioner's past experience with respect to payments made month by month on claims after their incurral dates. In order to quickly estimate its claim reserves at December 31, petitioner had previously adopted and, during the years under consideration, followed the practice of calculating its reserve factor at October 31 and multiplying this factor by its reserve base at December 31.[7] This estimate was then adjusted by an interest factor to arrive at the final aggregate amount of claim reserves to be reported for NAIC and tax purposes as of December 31.

To determine its reserve factor at October 31, petitioner had to first estimate its aggregate claim reserves, i.e., estimated total claims to be ultimately paid less total claims paid as of October 31. This amount was then divided by the reserve base as of October 31 in order to arrive at

---

[6]The method is referred to by respondent as the claim completion method. The same method is sometimes referred to in the industry as the claim development method, or lag studies method.

[7]Respondent has made no objection to this practice.

the reserve factor for October 31, which as stated before, was applied to the reserve base at December 31 to determine the aggregate estimated claim reserves as of that date.

To estimate the total claims to be ultimately paid, petitioner grouped all claims by the month of incurral. Petitioner then calculated a claim completion factor for each month of incurral through October. The claim completion factor was based on the company's past experience and, in effect, produced a prediction of how many dollars would eventually be paid on claims included in each month of incurral.

Petitioner's use of the claim lag method can be illustrated by assuming that as of October 31 of any year, $600,000 had been paid on claims incurred (assigned incurral dates) during the month of March of the same year. If petitioner's past experience indicated that 80 percent of claims incurred in March would be paid as of October 31, then the $600,000 would represent 80 percent of the total to be ultimately paid on March claims. The estimated ultimate total claim payments on March claims could then be computed as $750,000 ($600,000 divided by .80). Thus the estimated reserve for March claims as of October 31 would be the difference between the estimate of total March claims to be ultimately paid and the claims paid to date, or $150,000 ($750,000 minus $600,000).

With a similar computation for each month of incurral, the estimated aggregate reserves could be determined for October 31 or at any other given date.

The estimate of aggregate claim reserves for its medical reimbursement policies as determined in the above manner for December 31 of each of the years in issue was divided by petitioner into an accrued portion and an unaccrued portion using certain percentages based upon actuarial estimates which are acceptable to respondent. For each year, the accrued portion was reported by petitioner to the State regulatory agencies in its NAIC statement under Exhibit 11 (Claim Liability) and the unaccrued portion was reported under Exhibit 9, sec. B (Claim Reserves). On the NAIC form, and in the insurance industry, generally, the accrued portion of the claim reserve represents medical

services already rendered to the insured but unpaid by the insurance company as of the valuation date. It includes benefits which are due and payable by the company even though still subject to notification, verification, or contest. The unaccrued portion of a claim reserve represents benefits which are not yet due by the insurance company at the valuation date because the underlying medical services have not been rendered to the insureds even though the claim events, i.e., injuries or sicknesses from which such future benefits will arise, have already occurred.

On each of its income tax returns for 1972 through 1975, petitioner claimed deductions for the increases in both the unaccrued and accrued portions of its aggregate reserves as reported on Exhibits 9 and 11, respectively, of its NAIC forms. Respondent allowed the accrued portion as reflected by Exhibit 11. Respondent, however, recomputed the "unaccrued" portion of the claim reserves as shown on Exhibit 9 of petitioner's annual statements for each year and disallowed all of such reserves except the reserves pertaining to certain extended maternity benefits and extended benefits under the disability provisions of the medical expense policies. The following table reflects the benefits excepted from respondent's disallowance:

| Year | Deferred group maternity | Extended benefits/ loss of time/ disability |
|------|--------------------------|---------------------------------------------|
| 1972 | $444,292 | $340,766 |
| 1973 | 504,682 | 278,317 |
| 1974 | 489,851 | 184,521 |
| 1975 | 593,516 | 356,025 |

The following schedule contains respondent's total net adjustments to petitioner's reserves for the years 1972 through 1975:

INDIVIDUAL GUARANTEED RENEWABLE (GR)

| HOSPITAL/SURGICAL (Class 6) | 1972 | 1973 | 1974 | 1975 |
|-----------------------------|------|------|------|------|
| Total reserves (accrued and unaccrued)[1] | $159,972 | $126,061 | $436,532 | $477,452 |
| Percent accrued[1] | 35.3 | 48.55 | 37.04 | 41.25 |
| Amount accrued | $56,470 | $61,203 | $161,691 | $196,949 |
| Adjustments: | | | | |
| Amount unaccrued (total less accrued) | $103,502 | $64,858 | $274,841 | $280,503 |

| | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| **MAJOR MEDICAL** | | | | |
| (Class 7) | | | | |
| Total reserves (accrued and unaccrued) | $605,251 | $560,531 | $683,259 | $934,321 |
| Percent accrued[1] | 22.9 | 29.27 | 25.27 | 24.89 |
| Amount accrued | $138,603 | $164,067 | $172,660 | $232,553 |
| Adjustments: | | | | |
| Amount unaccrued (total less accrued) | $466,648 | $396,464 | $510,599 | $701,768 |
| Total adjustments to GR claim reserves: | $570,150 | $461,322 | $785,440 | $982,271 |

## INDIVIDUAL OPTIONAL RENEWABLE (OR)

| | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| **HOSPITAL/SURGICAL** | | | | |
| (Class G) | | | | |
| Total reserves (accrued and unaccrued) | $363,542 | $344,832 | $413,238 | $350,813 |
| Percent accrued[1] | 33.4 | 35.71 | 27.47 | 38.95 |
| Amount accrued | $121,423 | $123,140 | $113,516 | $136,642 |
| Adjustments: | | | | |
| Amount unaccrued total less accrued | $242,119 | $221,692 | $299,722 | $214,171 |
| **MAJOR MEDICAL** | | | | |
| (Class H) | | | | |
| Total reserves (accrued and unaccrued) | $2,319,359 | $2,199,320 | $2,762,850 | $4,358,904 |
| Percent accrued[1] | 29.5 | 33.95 | 31.29 | 31.35 |
| Amount accrued | $684,211 | $746,669 | $864,496 | $1,366,516 |
| Adjustments: | | | | |
| Amount unaccrued (total less accrued) | $1,635,148 | $1,452,651 | $1,898,354 | $2,992,388 |
| Total adjustments to OR claim reserves | $1,877,267 | $1,674,343 | $2,198,076 | $3,206,559 |

| **GROUP POLICIES** | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Total claim reserves[2] (accrued and unaccrued) | $5,618,947 | $6,404,693 | $6,564,466 | $8,309,657 |
| Percent accrued[1] | 25.2 | 36.65 | 29.25 | 25.86 |
| Amount accrued | $1,415,975 | $2,219,226 | $1,920,106 | $2,148,877 |
| Adjustments: | | | | |
| Amount unaccrued (total less accrued) | $4,202,972 | $4,185,467 | $4,644,360 | $6,160,780 |
| Less: unaccrued exception for extended benefits (loss of time/disability) | ($340,766) | ($278,317) | ($184,521) | ($356,025) |
| Total group adjustments: | $3,862,206 | $3,907,150 | $4,459,839 | $5,804,755 |

COMBINED TOTAL ADJUSTMENTS

|  | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Individual guaranteed renewable (GR) reserves | $570,151 | $461,322 | $785,440 | $982,271 |
| Individual optionally renewable (OR) reserves | $1,877,267 | $1,674,343 | $2,198,076 | $3,206,559 |
| Group reserves | $3,862,206 | $3,907,150 | $4,459,839 | $5,804,755 |
| Grand total | $6,309,624 | $6,042,815 | $7,443,355 | $9,993,585 |
| Less: Prior years' adjustments | - - - | ($6,309,624) | ($6,042,815) | ($7,443,355) |
| Total net adjustments | $6,309,624 | ($266,809) | $1,400,540 | $2,550,230 |

[1]Derived from percentages used by petitioner in dividing the total A & H medical expense reserves into the accrued (Exhibit 11) and unaccrued (Exhibit 9) portions of the annual statement. Respondent used these same percentages in connection with his determination.
[2]The unaccrued exception for deferred maternity benefits is not included in the totals.

## Claim Runout Schedules

With respect to the claim reserves for its medical reimbursement policies, petitioner maintained for each of the years in dispute schedules known as claim runs or claim runouts for the following 6 years. These schedules were used by petitioner in the preparation of its NAIC forms.[8] The table below reflects on an aggregate basis the percentages of the medical expense claim reserves of petitioner for each of the years in dispute which were utilized for claim payments by the end of the following 6 years:

|  | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Year 1 | 74.5% | 74.9% | 82.8% | 71.0% |
| Year 2 | 85.4 | 90.1 | 99.1 | 84.8 |
| Year 3 | 91.6 | 96.9 | 106.9 | 90.7 |
| Year 4 | 95.0 | 101.3 | 110.7 | 92.3 |
| Year 5 | 97.8 | 103.6 | 111.8 | 93.1 |
| Year 6 | 99.4 | 104.4 | 112.4 | 93.9 |

During each of the years under consideration, petitioner maintained and reported on its annual statements a reserve for unearned premiums on its medical expense policies. An unearned premium reserve is maintained by an insurance company in order to reflect the amount of premiums which have been received by the reporting date but which are not yet considered as being earned.

[8]Petitioner was not required by NAIC to maintain the claim runout schedules beyond 3 years.

For each of the years 1972 through 1975, petitioner determined its unearned premium reserve for its medical expense policies on the basis of the pro rata lapse of time. Petitioner's method of reserving unearned premiums can be illustrated by assuming that on December 1 of any given year a 1-year premium for a medical expense policy was received. On December 31 of that year, one-twelfth of the premium would be considered as earned and the other eleven-twelfths of the premium would be considered as unearned and would be reflected in the unearned premium reserve.

Respondent does not challenge petitioner's use of the claim lag method for computing its claim reserves including the use of its October 31 reserve factor to compute the claim reserves at December 31. Respondent contends, however, that petitioner overstated its claim reserves and its resulting deductions under section 809 by assigning incorrect incurral dates to its claims. On brief, respondent admits "that, in principle, some further amounts" than those recognized in the statutory notice might be allowable as deductions but insists that he was unable during his audit to make a determination with respect to such "further amounts" because the "statute of limitations was about to expire, and petitioner declined to extend the statutory period."

Petitioner contends (1) that its assignment of incurral dates is proper; (2) that the deductions claimed with respect to its reserves are correct; (3) that respondent's determination with respect to the reserves is so arbitrary and unreasonable it does not qualify for the usual presumption of correctness, and, as a result, respondent has the burden of proof, which we treat as a request that the burden of going forward with the evidence be shifted to respondent, with respect to the correct amount of the reserves; and (4) that in the alternative, if petitioner's computation of the reserves is incorrect, petitioner is entitled to spread any adjustment for the year 1972 over the 10-year period provided by section 810(d).

OPINION

*Burden of Going Forward With the Evidence*

For convenience, we will first consider petitioner's contention that respondent's determination with regard to the claim reserves as set forth in the statutory notice is so arbitrary and unreasonable that the determination is not entitled to its usual presumption of correctness and consequently respondent has the burden of going forward with respect to the correct amount of such reserves. In support of this position, petitioner relies upon *Helvering v. Taylor*, 293 U.S. 507 (1935), in which it was held that where the taxpayer had demonstrated that the Commissioner's determination of gross income was arbitrary and unreasonable, the burden of going forward with the evidence shifted to the Commissioner to prove the correct amount of gross income. Petitioner also relies upon *Higginbotham v. United States*, 556 F.2d 1173 (4th Cir. 1977); *Demkowicz v. Commissioner*, 551 F.2d 929 (3d Cir. 1977); *Bar L. Ranch, Inc. v. Phinney*, 426 F.2d 995 (5th Cir. 1970); *Welch v. Commissioner*, 297 F.2d 309 (4th Cir. 1961); and *Clark v. Commissioner*, 266 F.2d 698 (9th Cir. 1959).

Petitioner's reliance in this case upon *Helvering v. Taylor*, *supra*, and the above decisions by the Courts of Appeals for the Third, Fourth, Fifth and Ninth Circuits is clearly misplaced, however, because the question confronted here is the correct amount of petitioner's deduction for claim reserves under section 809(d) and not whether a certain item is includable in gross income. The distinction is important because in *Helvering v. Taylor*, *supra*, the Supreme Court carefully pointed out that contrary to its conclusion with respect to gross income "the burden is upon the taxpayer to establish the amount of a deduction claimed." In fact, it is well established that this burden is always upon the taxpayer. *Roberts v. Commissioner*, 62 T.C. 834 (1974). See also *Rockwell v. Commissioner*, 512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, in which the Court of Appeals stated at page 886, "Whatever the proper rule may be where inclusion in income is controverted, there is no dispute that the taxpayer bears the burden of proof in substantiating claimed deductions." See

also *Nor-Cal Adjusters v. Commissioner*, 503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court, and *Clapp v. Commissioner*, 321 F.2d 12 (9th Cir. 1963), affg. 36 T.C. 905 (1961), where it is stated that "The burden of proving a deductible loss and its amount is always upon the taxpayer." To the same effect, see also *Brimberry v. Commissioner*, 588 F.2d 975 (5th Cir. 1979), and *Mills v. Commissioner*, 399 F.2d 744 (4th Cir. 1968). In *Nor-Cal Adjusters v. Commissioner, supra*, the Ninth Circuit observed as follows:

When as here, a taxpayer claims a deduction which is disallowed by the Internal Revenue Service, the burden is on the taxpayer to prove to the Tax Court the merit of the deduction. The shifting of that burden can only be caused by the interjection of 'new matter' as provided by Rule 32 of the Rules of Practice of the United States Tax Court. [503 F.2d at 361.]

Other circuits have reached the same conclusion. See *Doyal v. Commissioner*, 616 F.2d 1191 (10th Cir. 1980); *Oliver v. Commissioner*, 364 F.2d 575 (8th Cir. 1966); *Lehman v. Commissioner*, 129 F.2d 288 (2d Cir. 1942).

In view of the foregoing, it is apparent that petitioner in this case has the burden of proof and the burden of going forward with regard to the proper amount of its deduction for claim reserves. This would be true even though we were able to conclude, which we cannot on this record, that under all of the relevant facts respondent's determination was arbitrary and unreasonable. *Chaum v. Commissioner*, 69 T.C. 156 (1977).

## Claim Reserves for Medical Reimbursement Policies

With respect to this issue, petitioner contends that the deduction of the increases in the unaccrued portions of its reserves, as shown on Exhibit 9 of its NAIC statements are properly allowable under section 809(d)(2), section 801(c)(2), and section 810 as increases to a reserve for "unpaid losses (whether or not ascertained)." Petitioner also contends that under section 818(a)(2) the deductions are proper because its method of computing the reserves is consistent with the computation of such reserves "for purposes of the annual statement approved by the National Association of Insurance Commissioners."

Respondent first contends that the deductions with respect to unaccrued claims are not allowable because under sections 801, 809, and 810 and the regulations applicable thereto "unpaid losses" and "losses incurred" refer only to *existing* liabilities of the petitioner at December 31 of the years under consideration. Respondent then concludes that the unaccrued claims were not in existence on December 31 because of the provision in every policy that Time's liability only extended to covered expenses incurred while the policies were in force.

Respondent further contends that the correct amount of petitioner's deductions for losses incurred or reserves therefor cannot be determined for income tax purposes by reference to the accounting requirements of the NAIC.

As a life insurance company, petitioner is taxable under sections 801 through 820 as they existed during the years in issue. These sections comprise a three-phase taxing scheme that first appeared in the Life Insurance Company Income Tax Act of 1959.[9] In this case we are concerned only with phase two of the taxing scheme, the determination of petitioner's gain or loss from operations and particularly the deductions it is entitled to under section 809(d), the pertinent portions of which are as follows:

SEC. 809(d). DEDUCTIONS.—For purposes of [gain or loss from operations], there shall be allowed the following deductions:

(1) DEATH BENEFITS, ETC.—All claims and *benefits accrued,* and *all losses incurred (whether or not ascertained),* during the taxable year on insurance and annuity contracts * * *

(2) INCREASES IN CERTAIN RESERVES.—The net increase in reserves which is *required by section 810* to be taken into account for purposes of this paragraph.

[Emphasis added.]

The net increase in reserves to be taken into account under section 809(d)(2) is determined under section 810(b) and (c) in the following manner:

(b) ADJUSTMENT FOR INCREASE.—If the sum of the items described in subsection (c) as of the close of the taxable year * * * exceeds the sum of such items as of the beginning of the taxable year, the excess shall be taken into account as a net increase referred to in section 809(d)(2).

[9]Pub. L. 86-69, 86th Cong., 1st Sess. (1959), 73 Stat. 112.

(c) ITEMS TAKEN INTO ACCOUNT.—The items referred to in subsection[s] * * * (b) are as follows:

\* \* \* \* \* \* \*

(2) The unearned premiums and *unpaid losses included in total reserves under section 801(c)(2)*. [Emphasis added.][10]

Briefly stated, respondent's principal argument appears to be that since petitioner's liability under all of its policies is limited to covered medical expenses *incurred while the policies are in force*, petitioner's assignment of incurred dates results in an overstatement of its claim reserves as reported on Exhibit 9 to its NAIC statements and hence an overstatement of its income tax deductions under section 809 for increases in such reserves. In respondent's view, both overstatements occur because with the use of petitioner's incurred dates, the yearend reserves include reserve amounts for liabilities not yet "in existence" and which may never be in existence because the applicable policies may not be in force at the time the covered expenses are incurred by the insureds because of previous lapses, cancellations, or terminations.

According to respondent, the proper incurred date for each claim arising under petitioner's policies is the day upon which a covered expense becomes an "existing" liability of petitioner. In his view, this is the day that the medical service or expense underlying the claim is rendered to the insured *provided* the applicable *policy is in force* at that time. Respondent insists that this is the proper incurred date rather than the date used by petitioner because of the possibility that after the date used by petitioner and before the date advocated by respondent, the policy may cease to be in force by reason of a lapse, cancellation, or termination.

We are unable to agree with respondent's view of the correct method for assigning incurred dates for the following reasons:

---

[10]During the years under consideration, sec. 801(c) read as follows:

SEC. 801(c). TOTAL RESERVES DEFINED.—For purposes of subsection (a), the term "total reserves" means—

    (1) life insurance reserves,

    (2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

    (3) all other insurance reserves required by law.

The term "total reserves" does not include deficiency reserves (within the meaning of subsection (b)(4)).

(1) The use of respondent's method would eliminate the need for section 809(d)(2), because under his method, all benefit claims in any year would be assigned incurred dates on or before December 31, and hence at the end of the year, all such claims would be deductible under section 809(d)(1) as losses incurred and there would be no need for any claim reserves and, consequently, no increase in claim reserves to qualify for deduction under section 809(d)(2).[11]

(2) To adopt respondent's method would also require one to ignore the fact that at the end of any year, petitioner obviously has some liability in an unascertained amount under some medical expense policies *in force* (a) with benefit periods extending 1, 2 and possibly close to 3 years into the future; (b) on which policies claim events (injuries or sicknesses) have already occurred; and (c) which claim events will result in covered medical expenses being incurred by the insured during the benefit periods and while the policies still are in force either because of the premiums already received by petitioner and included in current income or set aside in its reserve for unearned premiums for inclusion in income when earned in the future.

(3) The adoption of respondent's method of assigning incurred dates would also force one to ignore the fact that, as discussed in (6) below, petitioner has established it can from past experience reasonably estimate at the end of any year on an aggregate basis the amount of claims which would be in the situation described in paragraph (2) above and the amount of risk associated with such claims.

(4) In order to adopt respondent's method, we would also have to overlook the fact that neither respondent, his experts, nor the experts for petitioner know of any insurance company which uses the method advocated by respondent for the assignment of incurral dates on claims under medical reimbursement policies. In fact, the consensus of all the experts appears to be that it would be impossible for an insurance company to administer such claims with the use of such a method because of the astronomical increase in

---

[11]As noted by petitioner, acceptance of respondent's theory with regard to reserves for medical expense policies would require one to also accept the reasoning that a life insurance company cannot establish a reserve for a life policy until the death of the insured because it is not known until that time that the policy will not lapse prior to the insured's death for nonpayment of premiums.

the number of incurral dates (the date upon which each of the covered medical expenses is paid while the applicable policy is in force).

(5) Respondent's contention in this case with respect to incurral dates and the resulting disallowance of deductions for increases in petitioner's reserves for unpaid losses because petitioner's liability is not "in existence" at yearend is inconsistent with respondent's treatment of "losses incurred (whether or not ascertained)" in the regulations issued by respondent under section 809(d)(1) and section 809(d)(2).

The "losses incurred (whether or not ascertained), during the taxable year" for which a deduction is allowed in section 809(d)(1) is defined in section 1.809-5(a)(1), Income Tax Regs., as "a reasonable estimate of the amount of losses * * * *incurred but not reported by the end of the taxable year* as well as losses reported but where the amount thereof cannot be ascertained by the end of the taxable year." (Emphasis added.)

The increase in reserves for which a deduction is allowable under section 809(d)(2) includes any increase for "unpaid losses" as defined in section 1.801-5 of the regulations, which section, in turn, incorporates by reference, the definition of unpaid losses found in section 1.801-3(g), Income Tax Regs., as "a reasonable estimate of the amount of the losses * * * (1) Reported and ascertained by the end of the taxable year, but [unpaid], (2) Reported by the end of the taxable year, but [neither ascertained nor paid], or (3) *Which have occurred by the end of the taxable year, but which have not been reported or paid* ." (Emphasis added.)

In spite of respondent's insistence to the contrary, we are unable to conclude that the estimated losses underlying petitioner's reserves, as well as its increases to such reserves, do not constitute "a reasonable estimate of the amount of the losses * * * which have occurred by the end of the taxable year but which have not been reported or paid," as provided in section 1.801-3(g)(3),Income Tax Regs., and "a reasonable estimate of the amount of the losses * * * incurred but not reported by the end of the taxable year," as provided in section 1.809-5(a)(1), Income Tax Regs.

Respondent, however, contends that under the foregoing sections of the Code and regulations, the phrases "unpaid losses" and "losses incurred" have reference solely to *existing* liabilities of the insurer at the yearend even though payment of such liabilities is admittedly contingent in some respects, such as for example, upon continued disability of the insured or his incurral of an expense. Respondent concludes, therefore, that if a liability is to be recognized for tax purposes, whether as an unpaid loss under section 809(d)(1) or as an element to be taken into account in reserves under section 809(d)(2), it must fall within one of the three categories enumerated in section 1.801-3(g) of the regulations. We agree, except that we find that such items fall within the third category set forth in section 1.801-3(g), Income Tax Regs.

It appears that respondent's position in this case is very similar to that in *Bituminous Casualty Corp. v. Commissioner*, 57 T.C. 58, 82 (1971), where we found that respondent had seized upon the word "liability" and sought to give it a new meaning in order to disallow a reserve for retrospective rate credits contrary to the regulation under section 832. Here he seeks to have us define "unpaid losses" and "losses incurred" as "existing liabilities" contrary to sections 1.801-3(g), 1.801-5, and 1.809-5(a)(1) of the Income Tax Regulations.

In *Bituminous Casualty Corp. v. Commissioner, supra* at 83, as a test for "liability" respondent advocated whether "All occurrences, i.e., injuries, accidents or other covered events, have taken place, on the basis of which the retrospective premium will ultimately be determined." In *Bituminous*, we rejected his argument for two reasons (a) there was no authority either in the case law or in insurance practice for such a definition of the word "liability" and (b) the word did not appear in the section of the Code which was there under consideration but appeared in the regulations and we were satisfied that if the Treasury had intended the word to carry the specialized meaning advanced by respondent, it would have said so in the regulations.

Although *Bituminous* involved a casualty company and section 832, we believe that the conclusion reached therein

on this point is equally applicable here where respondent has produced no authority for his definition of "unpaid losses" and 'losses incurred' as being an *existing liability*, the word liability does not appear in section 809(d)(1) or (2) or in the regulations applicable thereto, and if Congress or the Treasury had intended the phrases to carry such new and specialized meanings as advocated by respondent, they surely would have said so in section 809 or its regulations.

(6) Finally, we are unable to agree with respondent's method of assigning incurral dates because from the record as a whole we are satisfied that petitioner's computation of the claim reserves by the use of its incurral dates and the claim lag method is consistent with the applicable State law, the NAIC requirements, and, under section 818(a), with the provisions of section 809 and the regulations applicable thereto.

In support of its claim reserves, petitioner called three expert witnesses. The first was William A. Halvorson of Milliman & Robertson, Inc., consulting actuaries, Milwaukee, Wisconsin. Mr. Halvorson has been a fellow in the Society of Actuaries, the highest designation of actuary in the United States since 1954, and was president of the Society of Actuaries during 1977 and 1978, and at the time of the trial was the president of the American Academy of Actuaries. He has been the consulting actuary for petitioner since 1964.

Mr. Halvorson testified that the claim lag method used by petitioner is the most common actuarial method used to determine claim reserves for medical expenses, that petitioner properly employed the method, and that in his opinion, it is the best actuarial method available to reflect an insurance company's true experience with respect to claim payments. In the opinion of Mr. Halvorson, petitioner's procedure for the assignment of incurral dates is an acceptable and correct procedure and its claim reserves, both accrued and unaccrued, as produced with such incurral dates are proper and correct. He testified that in his opinion, any change in petitioner's method of determining claim reserves would result in a similar and offsetting change in its unearned premium reserves.

Mr. Halvorson rejected the method of assigning incurred dates espoused by James J. Olsen, one of respondent's expert witnesses, because, according to Halvorson, the method recommended by Olsen contemplated that all policies terminated on the valuation date, and any method which included such a contemplation was improper. Mr. Halvorson also stated that the claim lag method as used by petitioner takes into account the company's actual experience in the past with policy terminations, for nonpayment of premiums, or otherwise. Halvorson testified that in any event, the use of the method recommended by Olsen as explained in his report would result in the allowance of a major portion of the claim reserves which were disallowed by respondent in the statutory notice.

The second expert witness called by petitioner was Anthony J. Houghton, of Tillinghast, Nelson & Warren, Inc., consulting actuaries, St. Louis, Missouri. Mr. Houghton is a fellow in the Society of Actuaries and a charter member of the American Society of Actuaries. He is also a fellow in the Conference of Actuaries in Public Practice and several other actuarial organizations. He devotes at least 90 percent of his time to the area of health insurance and reserving methods, both individual and group.

Mr. Houghton testified that the most appropriate incurral date for major medical coverage is the date the first medical expense is incurred by the insured which satisfies the deductible amount in the policy. He stated that policy language which requires the expense to be incurred while the policy remains in force is common language in the industry and should not affect or change the commonly accepted methods of assigning incurral dates. Prior to trial, he had surveyed the incurral dating methods used by other insurers in the same line of business as petitioner and found that petitioner's methods in this respect were consistent with the methods commonly used by such companies. He was unable to find any company among those surveyed which used an incurral dating method similar to that proposed by respondent. In his opinion, the method proposed by respondent is unreasonable, not actuarily acceptable, and would lead to improper reserving practices. He

was not aware of any insurance company which assigned incurral dates in accordance with respondent's proposed method. He stated that the 1977 NAIC advisory committee report which was referred to and relied upon to some extent by Mr. Olsen, discussed only minimum reserves, did not support Mr. Olsen's position, and had not been formally adopted by the NAIC or by any State.

The third expert witness called by petitioner was Bradford S. Gile, a professional actuary employed by the Wisconsin Department of Insurance. Part of his responsibility is to review the reserving practices by insurance companies within the jurisdiction of the department and to determine whether the reserves shown on their NAIC annual statements are proper. If they are determined not to be, it is his responsibility to require the substitution of an examiner's reserve.

Mr. Gile testified that the claim lag method is used by the Wisconsin Department of Insurance to verify the sufficiency of reserves subject to its regulations, and that under the applicable State law, the Wisconsin Commissioner of Insurance is empowered to set reserve standards and to adjust reserves if they do not bear an appropriate relationship to the company's obligations under its policies. Mr. Gile also testified that under the reserving standards established by section Ins. 3.17 of the Wisconsin Administrative Code, medical expense claim reserves must be based on the individual company's own experience and other assumptions designed to place a sound value on the underlying claims. Under the applicable State law, the reserves are to be verified by the development of each year's claims over a period of years as set forth in Exhibit O to the NAIC annual statements. He testified that during the years under consideration, petitioner maintained claim runout schedules which were acceptable to his department, and that as an actuary for the State of Wisconsin, he had no disagreement with the incurral dating and the claim development method used by petitioner.

Mr. Gile testified that in his opinion the Wisconsin Department of Insurance would not accept claim reserves established in the manner proposed by respondent, and he sharply disagreed with Mr. Olsen's position that reserves

are not required for expenses incurred by an insured after a reserve valuation date, unless the policy, by its terms, is continued in force after the valuation date. He stated that his department did require such reserves under such circumstances. He also disagreed with Mr. Olsen's proposed assignment of incurral dates (the dates on which the insured incurs each separate expense). In Mr. Gile's opinion, his department would not permit the use of such a method of assigning incurral dates. He said that under the reserve method proposed by respondent and his expert, there is an implicit assumption that all policies terminate on each valuation date, and that with this assumption, a proper reserve cannot be developed for such policies and that a reasonable rate structure could not be devised to accommodate such an incurral dating method.

With respect to the 1977 advisory committee report relied upon by Mr. Olsen, Mr. Gile stated that the report has never been adopted by NAIC, the State of Wisconsin, or to his knowledge by any other State. He stated that he was a member of the NAIC committee to which this advisory report was directed, and that it was his understanding that the report was designed to recommend minimum reserves, but that even in this respect, the report has never been followed.

Mr. Gile stated that he was thoroughly familiar with the use of the claim lag method and had carefully reviewed the method as used by petitioner and that, in his opinion, the company's experience with policy terminations for any reason and the effect of policy terminations on the payment of claims is reflected in the statistics used by the claim lag method and thus would be reflected in the reserve which results from the development of the statistics.

Mr. Gile explained the relationship between a company's pricing methods and its reserving methods and indicated that there must be a correlation between the two. He explained that pricing in accordance with the Olsen method of assigning incurral dates would result in a rapidly escalating rate structure since medical expenses attributable to losses incurred in prior policy periods, as well as the expenses attributable to the losses incurred in subsequent periods, would both have to be paid out of premiums in the

subsequent periods. He said that such a practice would result in an impractical and "nightmarish" rate structure that would lead to difficult adverse selection problems by the company, because as the premium rates rose in later policy years, only high-risk policyholders in claim status would be likely to retain their policies. Mr. Gile testified that from his experience, he knows of no insurance company which has attempted to price policies in this fashion. He also stated that petitioner's policy language that requires the expense to be incurred while the policy is in force is almost universal language and would have no particular bearing on any of his conclusions.

We found each of petitioner's experts to be extremely knowledgeable, forthright, and credible, and from their reports and testimony, we are satisfied that petitioner's method of assigning incurral dates to claims and its use of the claim lag method to compute claim reserves are proper and correct. For the same reasons we are also satisfied that petitioner's computations of claim reserves for its medical expense policies at the end of each of the years 1972, 1973, 1974 and 1975 are correct, proper, and in accordance with the NAIC requirements and the laws of Wisconsin.

The requirements applicable to all computations entering into the determination of income taxes imposed against life insurance companies are contained in section 818(a), the pertinent portions of which read as follows:

SEC. 818(a). METHOD OF ACCOUNTING.—All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

*Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.* [Emphasis added.]

The above section first appeared in the Life Insurance Company Income Tax Act of 1959 and the following language makes it clear that Congress recognized the importance of the changes made therein:

6. *Requirement of accrual accounting and related adjustments.*—Both the House and your committee's version of the bill provide that computations in determining life insurance company taxable income are to be made on an accrual basis and, to the extent not inconsistent with other income tax provisions, in the manner required in making the annual statement to the insurance commissioners. Since under prior law accrual basis accounting was not required, this necessitates adjustments for those who previously have not been on an accrual basis. * * * [S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 793.]

\* \* \* \* \* \* \*

(a) *Method of accounting.*—Subsection (a) of section 818 * * * provides the general rule that all computations * * * shall be made under an accrual method of accounting. This subsection further provides that, to the extent permitted under regulations * * * , a life insurance company may determine its taxes under a combination of an accrual method of accounting with any other method * * * . *To the extent not inconsistent with the provision of the 1954 Code and an accrual method of accounting, all computations * * * shall be made in a manner consistent with the manner required for purposes of the annual statement * * * .* [S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 823. Emphasis added.]

The pertinent language of the report of the Ways and Means Committee of the House is to the same effect. H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 736, 748, 766.

Respondent contends that under section 818(a) and the foregoing legislative history, any deduction allowable under section 809(d) or (c) must be computed under, and in accordance with, the accrual method of accounting. Petitioner contends that under the last sentence in section 818(a), petitioner is required to compute its reserves "in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners," because reserves for life insurance companies as referred to in section 809 and the related sections of the Code, and in the NAIC forms, have no counterpart in accrual accounting and, therefore, there is no inconsistency between the accrual method of accounting and the method required by the NAIC for use in the preparation of its annual statements. Petitioner concludes, therefore, that since neither accrual accounting, the Code, nor the regulations provide any guidance for the computation of the reserves in issue in this case, the last sentence of section

818(a) is applicable and the NAIC procedure controls for income tax purposes.

The general rules of accrual accounting and the applicable sections of the Code and regulations are silent with regard to the question of the method for determining the reserves under consideration in this case. However, the NAIC form and its accompanying instructions contain detailed specifications as to how the reserves are to be calculated. Under similar circumstances, the Supreme Court has held that the NAIC accounting procedures are to govern. *Commissioner v. Standard Life & Accident Insurance Co.*, 433 U.S. 148 (1977). The question considered by the Supreme Court in *Standard Life* was the extent to which a life insurance company must include unpaid premiums in its reserves. The Court concluded that since no Code section or regulation addressed the issue, the only approach which was permitted by the Internal Revenue Code was the approach of NAIC as specified in the last sentence of section 818(a).[12] The Court's conclusion is stated as follows:

The legislative history makes it clear that the accounting procedures established by the NAIC apply if they are "not inconsistent" with accrual accounting rules. In other words, except when the rules of accrual accounting dictate a contrary result, NAIC procedures "shall" apply. [ 433 U.S. at 158-159. Fn. ref. omitted.]

*Under section 818(a), rejection of the NAIC approach would be justified only if it were found inconsistent with the dictates of accrual accounting.* But the general rules of accrual accounting simply do not speak to the question of the scope to be given the entirely fictional assumption required by this statute. Any one of the four approaches has an equally good—or equally bad—claim to being "an accrual method." *Since general accounting rules are not controlling, the statute requires use of the NAIC approach to fill the gap.* [433 U.S. at 162. Emphasis added.]

The position taken in *Standard Life* is in accordance with the deference which the Supreme Court has paid in similar

---

[12]Tax scholars have interpreted *Standard Life* to mean that annual statement rules control unless they are inconsistent with the accrual method. See generally K. Tucker & D. Van Meghem, Federal Taxation of Insurance Companies, par. 3.01 (1982), and Ernst & Whinney, Federal Income Taxation of Life Insurance Companies, Release No. 1 (Special Supp.), at 43 (1984). See also the Conference Committee report accompanying the Deficit Reduction Act of 1984 which reveals that minor changes were made to subch. L in 1984 to conclusively establish the predominance of the accrual method over annual statement accounting for Federal income tax purposes. NAIC methods apply only to the extent not inconsistent with accrual accounting. H. Rept. 98-861 (Conf)., at 1060, 1061 (1984), 1984-3, C.B. 314, 315 (1984).

situations to accounting methods required by other regulatory authorities. See *Commissioner v. Idaho Power Co.*, 418 U.S. (1974).

In this case the claim runout data developed by petitioner indicates beyond any doubt that its claim payments were consistent with the amounts established in its reserves. It is apparent, therefore, that petitioner during the years under consideration was in substantial compliance with the reserve requirements of NAIC.

In view of all of the foregoing, we conclude that petitioner has carried its burden of proving that during each of the years 1972 through 1975, its medical insurance claim reserves were properly computed and the deductions claimed with respect thereto are allowable.[13]

*Decision will be entered under Rule 155.*

---

[13]Our disposition of this issue also disposes of the issue with respect to the spread forward under sec. 8l0(d).