NORTH CENTRAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22761-81.          Filed February 6, 1989.

*Bruce J. Shnider, Leslie J. Anderson,* and *Phillip H. Martin,* for the petitioner.

*Judy Jacobs* and *Ross A. Rowley,* for the respondent.

OPINION

COHEN, *Judge:* This matter was assigned to Special Trial Judge Pate, for consideration and ruling pursuant to the provisions of section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514,

100 Stat. 2755) and Rules 180, 181, and 183.[1] The Court agrees with and adopts her opinion which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

PATE, *Special Trial Judge:* Respondent determined deficiencies in petitioner's Federal income taxes for the years 1972 through 1976 in the following amounts:[2]

| Year | Deficiency |
|------|-----------|
| 1972 | $39,195.91 |
| 1973 | 4,473.56 |
| 1974 | 538,531.96 |
| 1975 | 189,476.68 |
| 1976 | 319,320.94 |
| Total | [3]1,090,999.05 |

Petitioner timely filed a petition alleging error in respondent's determination regarding certain "retroactive rate credits."[4] Specifically, we must decide:[5] (1) Whether petitioner's "retroactive rate credits" are deductible as "dividends to policyholders," "return premiums," or "commissions;" (2) whether petitioner may take into account changes in its reserve for retroactive rate credits in computing the amount of the deduction; and (3) if not, whether disallowance of petitioner's reserve for retroactive rate credits constitutes a change in method of accounting.

## FINDINGS OF FACT[6]

North Central Life Insurance Co. (hereinafter petitioner) is a stock life insurance company organized under the laws of the State of Minnesota, with its principal office and place of

[1]Unless otherwise specified, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The deficiencies for 1972 and 1973 resulted from the disallowance of net operating loss carrybacks from the latter years in issue.

[3]Respondent also determined deficiencies in petitioner's Federal income taxes for the years 1977, 1978, and 1979 in the amounts of $349,858, $156,858, and $1,002,931, respectively. A petition was filed (docket no. 7739-86) raising the same issues litigated here. The parties have stipulated that they will be bound for those subsequent years by the final decision in this case.

[4]The notice of deficiency includes other determinations not raised in the petition.

[5]Prior to trial, petitioner filed a motion for summary judgment pursuant to Rule 121, which was denied on Sept. 2, 1986, because there were factual issues to be resolved. Trial was held on those issues May 26 to 29, 1987, in St. Paul, Minnesota.

[6]Many of the facts have been stipulated. The stipulation of facts, the two supplemental stipulations of facts, and the attached exhibits are incorporated herein by this reference.

business in St. Paul, Minnesota. Petitioner was a life insurance company as defined in section 801 et seq. For each of the calendar years 1972 through 1976, it filed Federal income tax returns on Forms 1120L (U.S. Life Insurance Company Income Tax Return) together with required schedules and attachments.

Insurance companies are regulated by the States in which they do business. As part of that process, they are required to file each calendar year a detailed "annual statement" prescribed by the National Association of Insurance Commissioners (hereinafter NAIC) with the State or jurisdiction of domicile and each State or jurisdiction in which they engage in the insurance business. Pursuant to section 1.6012-2(c)(1), Income Tax Regs., petitioner filed a copy of its annual statement with its Federal income tax return for each of the years in issue.

During the years in issue, petitioner's principal business consisted of the sale of credit life insurance and credit accident and health insurance (hereinafter collectively referred to as credit insurance) which it sold in connection with specific credit transactions. Credit life insurance provided coverage on the life of the person taking out a loan or financing a purchase (hereinafter borrower or insured) and provided for the repayment of the remaining indebtedness if the borrower died during the term of the insurance contract. Credit accident and health insurance provided that periodic payments due on the borrower's installment indebtedness would be made if, and while, he was disabled during the term of the insurance contract. Accident and health coverage could be obtained only if credit life was also purchased. In both types of insurance, the amount of the coverage decreased as the borrower made periodic or installment payments on the debt.

Petitioner issued credit insurance principally under a single premium plan. In most cases, the amount of the premium was relatively small. For example, in 1975, the average initial coverage was $2,660, and the average single premium was $65 for credit life, $71 for credit accident and health, and $110 for combined coverage.

Because the individual premiums were so small, petitioner used a procedure whereby group insurance policies were issued to "accounts" consisting primarily of financial insti-

tutions and automobile dealerships.[7] The accounts made loans or financed automobiles only for persons who the accounts had determined were creditworthy. Those borrowers who chose to purchase insurance[8] provided the accounts with an extra level of protection in that collection measures might not be necessary in the event of the borrowers' death or disability. Under the group policies, the accounts were authorized to issue a certificate of insurance (within agreed policy limits and without further approval) to borrowers who purchased coverage. The account was primary beneficiary of the policy to facilitate direct repayment of the loan in the event of the borrower's death or disability. The borrower had the right to designate a second beneficiary to which petitioner paid any benefits in excess of those needed to discharge his obligation to the account.

The account calculated the premium charged on the certificates of insurance it issued using rates provided by petitioner,[9] collected the premium from the borrower (either in cash or by adding the premium to the borrower's initial indebtedness), and then forwarded the premium, less any commissions due the account, to petitioner. The entire cost of the insurance was borne by the borrower; no contribution toward its cost was made by the account. The account also collected claim information, facilitated the payment of claims by completing forms provided by petitioner, and maintained records of certificate holders under the group policy. This arrangement made credit insurance more profitable to petitioner because, under the contract, the account was required to complete much of the paperwork (e.g., form completion, insurability screening).

Petitioner recruited new and provided service to existing accounts through sales representatives. The recruitment of accounts was competitive because, as a practical matter, credit insurance is a homogenous product. Accounts generally selected or remained with a particular insurance company based on the level of income and service offered to the account by competing companies. Consequently, the solicita-

---

[7]In addition to its group policies, petitioner wrote a minor amount of individual credit life and credit accident and health insurance policies. These policies are not at issue in this case.

[8]Most States prohibited an account from requiring a borrower to purchase insurance from it.

[9]Premiums charged for credit insurance are limited by State laws and regulations. Petitioner almost always charged the maximum amount permitted by law.

tion of new accounts by petitioner's representatives usually included a discussion of commissions and retroactive rate credits to be realized by the account.

Petitioner and the accounts generally executed three documents to effectuate this arrangement: a group policy,[10] a commission agreement, and a retroactive rate credit agreement. However, where the amount of compensation for the sale of credit insurance was limited by law, the commission agreement provided for the maximum allowable amount of compensation and the retroactive rate credit agreement was omitted.[11] The account had to agree to handle only petitioner's insurance during the term of their agreement.

Petitioner's group policy named the account as "policy-holder"[12] and provided specifically that it was "non-participating;" that is, the holder of the policy was not entitled to share in petitioner's surplus earnings. The account did not pay any premium for the group policy. Petitioner retained the power to terminate the policy upon notice if the number of insureds dropped below a specified percentage of all borrowers eligible for insurance. The account was able to cancel the policy for any reason upon 30 days' notice. In the event of cancellation, however, each borrower's coverage continued throughout the period for which he had paid premiums. The borrower could not cancel his coverage during its term except by discharging the underlying indebtedness.[13] If the borrower did cancel the insurance by prepaying his loan, petitioner then refunded a portion of the premium to the account who was required by

[10]Several different credit life policies were used by petitioner on a State-by-State basis during the years in issue. However, for purposes of our decision the differences between these various policies are not material.

[11]These laws generally limited total compensation to a stated maximum percentage of the premium. "Compensation" generally included commissions, dividends, and rate credits.

[12]Because of various State laws restricting insurance sales, sometimes an insurance agency related to the account was the named "policyholder."

[13]In contrast, life insurance typically is sold by an agent who sells the insured (or designated owner) a life insurance policy which, if participating, guarantees the policyholder the right to participate in the distribution of divisible surplus of the company (dividends). Although the company normally does not guarantee that there will be any divisible surplus earnings to be divided, to convince the customer to purchase the insurance, the agent usually shows him a nonbinding dividend illustration based on past dividends paid by the company and projected economic performance during the term of the contract. Generally, the customer pays the premium directly to the insurance company. He is usually the named "policyholder" and has the right to cancel the policy. The agent usually is paid a commission based on the amount of the premium.

the group policy to remit the refunded amount to the borrower.[14]

Under the group policy, the account was required to deliver a certificate of insurance to each borrower describing the coverage he had purchased.[15] The account submitted a list of certificate holders (borrowers) and remitted the premiums collected thereon to petitioner at stated intervals.[16]

Petitioner's commission agreement also listed the account as "policyholder." However, because States commonly require that persons selling life insurance be licensed, the commission agreement often was executed by an employee of the account who was a licensed insurance agent. Concurrently, the right to commissions was assigned to the account or a designee of the account. Commission rates were set in advance and usually amounted to 40 to 50 percent of the net premiums collected. These rates seldom varied, although petitioner's sales representatives were allowed to "bid" on certain large accounts in order to obtain their business. The bidding sometimes included petitioner's promise to deposit compensating balances in specified financial institutions.

---

[14]The group policy "premiums" clause provided in part that:

"In the event of termination of the indebtedness of a Debtor to the Creditor through prepayment, refinancing, or otherwise, the insurance on said Debtor shall be cancelled. Upon receipt of notification from the Creditor of the cancellation of insurance on any Debtor prior to the Expiration Date stated in the Certificate issued to said Debtor, the Company will refund to the Creditor any unearned portion of the premium paid to the Company by the Creditor on account of said Debtor's insurance in excess of any cancellation charges, all in accordance with refund tables on file with the Insurance Department of the state where this policy is issued, and the Creditor shall pay to the Debtor all or such part of said refund to which the Debtor is entitled."

[15]Petitioner supplied the certificates of insurance. Specifically, they provided in part that:

"In consideration of the payment in advance of the above Term Premium(s), the Company [petitioner] hereby insures the above named Debtor under a Creditor's Group Policy (herein called the 'Policy') issued to the Creditor [Account] named above, but only with respect to the coverage or coverages completed above * * *. The limit of the Company's liability against each such coverage shall be as stated herein, subject to all the terms, limitations and provisions of the Policy. Insurance under the Policy is for the above Term * * * . The limit of the Company's liability against such coverage shall be as stated herein, subject to all the terms, limitations and provisions of the Policy. Insurance under the Policy is for the above term."

[16]The group policy provided that:

"Premiums under this policy are payable as stated in the application herefor and shall be paid to the Company by the Creditor [the account] at the same time the Creditor shall furnish the Company with reports and information required pursuant hereto."

Petitioner incurred the following amounts under its commission agreements:

| Year | Amount |
|------|--------|
| 1974 | $4,987,103 |
| 1975 | 5,550,559 |
| 1976 | 9,932,495 |

Petitioner included these amounts in its deduction of commission expense on its 1974, 1975, and 1976 income tax returns. Respondent allowed the deduction of these commissions, and they are not in issue in this case.

The third document involved was a retroactive rate credit agreement.[17] It provided that the policyholder or its assignee (the account) would be eligible to receive a "retroactive rate credit" (generally, if it had produced $5,000 or more of net written premium during the calendar year) calculated as follows:[18]

The retroactive rate credit calculation shall be based upon premiums earned, pursuant to this and such other agreements as may be determined by the Company, during the contract year for which the calculation is made, in accordance with the following formula: From the net premium earned during the calculation period, the Company [petitioner] shall retain the equivalent to that certain amount as determined from the amount of Annual Net Written Premium submitted to the Company by the Policyholder [the account], as set forth in the Schedule attached hereto and hereby made a part hereof.[19]

---

[17]In 1980, this agreement was revised and the nomenclature changed. The revised agreement was entitled "Retrospective Commission Agreement" rather than "Retroactive Rate Credit Agreement." At trial, petitioner's witnesses sometimes referred to payments made pursuant to these agreements as "retrospective commissions."

[18]The group policy referred to the retroactive rate credit as follows:

"In addition to or in lieu of a reduction in the premium rate, at the beginning of any policy year the Company may make a retroactive rate reduction for the previous policy year. Such retroactive rate reduction, herein called 'retroactive rate credit' shall be applied in such manner as may be mutually agreed upon between the Company and the Creditor [Account]. Payment of a retroactive rate credit or its equivalent application shall completely discharge the liability of the Company with respect to the retroactive rate credit so paid or applied. No increase in premium rate shall be retroactive."

[19]For example, the retention schedule attached to one of the Retroactive Rate Credit Agreements provided in part:

| Annual net written premium during the year preceding the date of calculation | Company retention (in terms of percentage of premium) | Equivalent company retention (in terms of $ per $100 of decreasing life insurance |
|---|---|---|
| $5,000 — $9,999 | 25% | 0.1875 |
| 10,000 — 24,999 | 20 | 0.1500 |
| 25,000 — 29,999 | 18 | 0.1350 |

Thereafter, from the amount remaining there shall be deducted all earned commissions previously paid or advanced, losses incurred, and claim and/or contingency reserves chargeable to insurance written pursuant to agreement(s) between the Company and the Policyholder. Any balance then remaining following the preceding calculation *may be* paid the Policyholder as a "Retroactive Rate Credit"; except, such balance may be decreased by negative balances incurred under this or any other agreement between the Company and the Policyholder. If any final balance shall be a negative amount, such amount shall be carried over to subsequent yearly calculations of the retroactive rate credit, as an additional deduction in the preceding formula. [Emphasis added.]

In late 1976, the language on the agreement was changed from "may be paid" to "shall be paid" in conjunction with raising the minimum account size eligible to receive a retroactive rate credit. The revision did not affect existing agreements and the new forms were introduced to new accounts on a State-by-State basis. Thus, both the "old" and "new" forms were in use concurrently. This change did not modify the manner or method petitioner employed to calculate or pay retroactive rate credits.

The accounts did not completely understand the manner in which the retroactive rate credits were calculated, especially the deduction for the various reserves. However, they did have enough information to estimate roughly the amount due them, and they expected those amounts to be paid. In fact, at least one account changed to an insurance company other than petitioner for a time because the account was not receiving as large a retroactive rate credit as it had expected.

By requiring the subtraction of claims in determining the amount of retroactive rate credits it paid the account, petitioner sought to encourage accounts to sign up only those borrowers who represented good insurance risks,

| Annual net written premium during the year preceding the date of calculation | Company retention (in terms of percentage of premium) | Equivalent company retention (in terms of $ per $100 of decreasing life insurance) |
| --- | --- | --- |
| 30,000 — 39,999 | 17 | 0.1275 |
| 40,000 — 49,999 | 16 | 0.1200 |
| 50,000 — 99,999 | 15 | 0.1125 |
| 100,000 — 199,999 | 14 | 0.1050 |
| over — 200,000 | 13.5 | 0.10125 |

thereby reducing the likelihood of claims on petitioner.[20] In fact, the amount of the retroactive rate credit petitioner paid to the accounts varied widely based on amount of premiums collected and the number and magnitude of claims insureds made under the account's group policy. Overall, however, retroactive rate credits approximated 3 to 5 percent of total premiums and averaged approximately 15 percent of the commissions payable under the commission agreement.

Petitioner calculated retroactive rate credits for each account pursuant to the formula contained in its retroactive rate credit agreement based on the "contract year." However, petitioner paid these credits only to accounts which had produced a minimum net written premium of $5,000 or more. Petitioner made no material changes either in the formula or the method of calculation during the years in issue.[21] Petitioner made these calculations monthly, quarterly, semiannually, or annually as agreed upon between it and the account.

The calculation started with "net premium earned." The amount of "net premium earned" equaled premium submitted for the period, plus unearned premium at the beginning of the period, less unearned premium at the end of the period. From this amount, petitioner subtracted its retention. Petitioner determined its retention by multiplying net premium earned by the applicable retention percentage prescribed in the account's retroactive rate credit agreement. Since the retention percentage provided petitioner with an up-front "profit," it necessarily varied because of the differing premium rates chargeable under applicable State law. From the remainder, petitioner subtracted the following items: (a) Earned commissions paid or advanced

---

[20]It is obvious that at least three factors influenced an account's decision to try to sell insurance to a particular borrower: (1) The amount of commission on the sale; (2) the probability that a claim would be filed; and, (3) whether the account's retroactive rate credit balance was positive or negative. Because the amount of commission was so large relative to the amount of the average retroactive rate credit, the accounts may not have been strongly motivated to screen out borrowers with health problems. Moreover, if an account's retroactive rate credit balance with petitioner was already negative, it would be to the account's short term advantage to sell insurance to all risks in order to maximize the amount of its commissions. This was a viable alternative because, upon termination of the relationship, negative balances were absorbed by petitioner.

[21]In 1975, petitioner changed the computation of its mortality reserves (from the "1958 CSO 3%" to the "1958 CET 3%") but, this change was not taken into account for purposes of computing the retroactive rate credit reserve.

pursuant to the commission agreement; (b) losses incurred, including an amount for claim reserves; (c) increases in contingency reserves; and (d) for credit life insurance accounts only, a negative unearned reserve.

Losses incurred equaled claims paid plus the amount of the current period's claim reserve, less the amount of the previous period's claim reserve. Claims paid were the actual claims petitioner paid during the calculation period with respect to the credit insurance which the account wrote. The claim reserve was petitioner's estimate of the amounts which it would ultimately pay because of claims incurred but not yet reported, claims incurred and reported but not yet paid, and a portion of resisted claims, as determined at the end of the period. The factors petitioner used in determining claim reserves were the size of the account, claims paid to the account's certificate holders in the current and prior periods, and earned premium.

The contingency reserve was essentially a method to calculate the amount of net premium earned and unearned during a particular contract year. Petitioner determined the contingency reserve by multiplying "true earned premium" for the period (computed on the basis of the Rule of 78's for decreasing term credit life insurance and pro rata for level credit life insurance and credit accident and health insurance) by a percentage in accordance with a constant schedule established by petitioner. Petitioner added the product of the multiplication to the preliminary "true unearned premium." In effect, this "slowed" the payment of retroactive rate credits to the accounts. Upon termination, the amount of the account's contingency reserve eventually became zero as petitioner allocated all premiums to net premium earned.

Petitioner computed the unearned reserve for each account by deducting from "true unearned premium" for credit life insurance and the account's contingency reserve for all credit insurance: (a) The amount of retention; (b) the amount of commissions which would be applicable pursuant to the commission agreement and retroactive rate credit agreement; and (c) the account's portion of mortality reserves. If an account's unearned reserve was negative,

petitioner subtracted it from net premium earned for the particular period.

After petitioner deducted all the above-described amounts from "net premium earned," the resulting balance was the retroactive rate credit for the period. If the resulting balance was negative, petitioner carried it forward to the next period. If it was positive, petitioner paid it to the account. Petitioner did not pay any retroactive rate credits to the insureds.

When an account terminated or was canceled and the retroactive rate credit calculation resulted in a negative balance, petitioner absorbed that balance. If there was a positive balance, petitioner paid it to the account except that, under these circumstances, petitioner increased its retention percentage by 10 percent as authorized by the retroactive rate credit agreement.[22] Petitioner made a final calculation only after it determined and paid all losses and expenses arising from the insurance written by the account.

Petitioner paid retroactive rate credits to its accounts of $940,799 in 1974, $1,049,692 in 1975, and $1,032,486 in 1976 pursuant to the calculations described above.

Petitioner also established a reserve for retroactive rate credits (hereinafter reserve). Petitioner computed this reserve using the same formula for all years in issue. The reserve consisted of both earned and unearned portions. The "earned" portion was the major component, and it represented the aggregate amount payable under the retroactive rate credit agreements from the end of each contract year to December 31, except that the reductions for contingency reserves and negative unearned reserves were ignored. The "unearned" portion of the reserve was the aggregate of the unearned credit life insurance premium and contingency reserve for all credit insurance which petitioner estimated would become payable in the future as a retroactive rate credit assuming future life insurance claims equaled petitioner's mortality reserve for the account. The unearned portion of the reserve was negative on December 31, 1975, and December 31, 1976, indicating that, if future credit life claims were equal to the amount of petitioner's mortality

---

[22]The retroactive rate credit agreements provided that petitioner could waive the addition of 10 percent to its retention percentage. However, petitioner never did so.

reserve, petitioner would not have to pay any retroactive rate credits in the future with respect to its existing credit life insurance. Petitioner did not establish any reserve for credit accident and health insurance because of the unearned premium reserve required for the latter.

The balances in the reserve on December 31 of each of the years specified were:

| Year | Balance |
|------|---------|
| 1957 | $102,350 |
| 1973 | 1,579,825 |
| 1974 | 1,655,267 |
| 1975 | 1,316,943 |
| 1976 | 1,504,306 |

These balances reflect an increase in petitioner's reserve in 1974 of $75,442 and in 1976 of $187,363 and a decrease in 1975 of $338,224. Therefore, after petitioner adjusted the retroactive rate credits for changes in the reserve, they equaled:

| Year | Amount paid | Change in reserve | Total deduction |
|------|-------------|-------------------|-----------------|
| 1974 | $940,799 | $75,442 | $1,016,241 |
| 1975 | 1,049,692 | -338,224 | 711,368 |
| 1976 | 1,032,486 | 187,363 | 1,219,849 |

Petitioner took into account adjustments to the reserve in computing the amount of the deduction it claimed for commissions for Federal income tax purposes. Consequently, the use of the reserve in 1974, 1975, and 1976 actually decreased the commission deduction (thereby increasing underwriting income) by $75,519 over the 3-year period.

Petitioner also included the reserve on its annual statement as part of "commissions to agents due or accrued" and as part of the "commission" data in petitioner's credit accident and health exhibits. The reserve is also referred to in the "triennial reports" in connection with the examination of commissions.

In his notice of deficiency, respondent determined that retroactive rate credits paid by petitioner were dividends to policyholders and were subject to the limitations on deductibility applicable thereto. Respondent further determined

that no deduction was allowable with respect to petitioner's reserve for retroactive rate credits. In addition, respondent added $1,477,475 (the difference between the reserve balance on December 31, 1973, of $1,579,825 less the reserve balance on December 31, 1957, of $102,350) to petitioner's 1974 underwriting income because he determined that the disallowance of petitioner's reserve constituted a change in method of accounting.

## OPINION

### Characterization of the Retroactive Rate Credits.

The first issue for our decision is whether petitioner may deduct retroactive rate credits it incurred as "return premiums,' "commissions," or "dividends to policyholders." This issue is significant because the amount of dividends to policyholders that may be deducted by a life insurance company is strictly limited by subchapter L of the Internal Revenue Code.[23] There is no such limitation on deductions for return premiums or commissions.

Part I of subchapter L (sections 801 through 820), as revised and amended by the Life Insurance Company Income Tax Act of 1959, Pub. L. 86-69, 73 Stat. 112 (the 1959 Act), sets out a relatively complicated scheme for the income taxation of life insurance companies.[24] Basically, these provisions establish a three-phase approach for determining a life insurance company's taxable income. Sec. 802(b); see *American National Insurance Co. v. United States*, 231 Cl. Ct. 604, 608, 690 F.2d 878, 881 (1982); *North American Life & Casualty Co. v. Commissioner*, 63 T.C. 364, 369 (1974), affd. 533 F.2d 1046 (8th Cir. 1976). Phase I income is the lesser of: (1) The company's share of investment income or (2) gain or loss from operations (hereinafter underwriting income). Sec. 802(b)(1). In simple terms, the company's share of investment income consists of net earnings resulting from investments in excess of any

---

[23]Subch. L of the Code (secs. 801 through 844) governs the income taxation of insurance companies, generally.

[24]The Deficit Reduction Act of 1984 substantially changed the Federal income taxation of life insurance companies for tax years beginning after Dec. 31, 1983. See sec. 211 et seq., Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 720. These changes generally do not apply to the years at issue in this case.

investment earnings allocated to policyholders. Sec. 804. Underwriting income consists essentially of the company's share of investment income, insurance premiums, decreases in reserves, and net capital gains, less statutory deductions. Sec. 809(b) through (e). Phase II income is 50 percent of the amount by which underwriting income exceeds investment income. Sec. 802(b)(2). The other one-half of this excess is taxed as Phase III income, but only when it is actually distributed to, or specially reserved for, the company's shareholders. Sec. 802(b)(3); *Prairie States Life Insurance Co. v. United States*, 828 F.2d 1222 (8th Cir. 1987). After determining taxable income under this three-phase approach, it is taxed at standard corporate income tax rates. Sec. 802(a).

The major component of underwriting income is insurance premiums. Insurance premiums consist of the gross amount of premiums less "return premiums" and certain payments in connection with reinsurance. Sec. 809(c)(1). "Return premiums" are "amounts returned" which are "fixed in the contract" and do not depend on the "experience of the company" or the "discretion of management." Sec. 809(c)(1).[25]

The deduction from underwriting income for "commissions" is authorized by section 809(d)(11)[26] which permits life insurance companies generally the same business deductions allowed other trades or businesses, including a deduc-

---

[25]In computing underwriting income, sec. 809(c)(1) takes into account:

(1) Premiums.—The gross amount of premiums and other consideration, including—

(A) advance premiums,

(B) deposits,

(C) fees,

(D) assessments,

(E) consideration in respect of assuming liabilities under contracts not issued by the taxpayer, and

(F) the amount of dividends to policyholders reimbursed to the taxpayer by a reinsurer in respect of reinsured policies, on insurance and annuity contracts (including contracts supplementary thereto); less return premiums, and premiums and other consideration arising out of reinsurance ceded. Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums.

[26]During the calendar years 1974 through 1976, the provision concerning "other deductions" was found in sec. 809(d)(12). For taxable years beginning after Dec. 31, 1976, sec. 1901(a)(98) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1781, redesignated paragraph (12) as paragraph (11). For convenience, the provision concerning "other deductions" will be labeled sec. 809(d)(11).

tion for compensation for personal services under section 162(a).[27] Compensation for personal services includes "commissions" provided they are in fact payments for services and are reasonable in amount. Secs. 1.162-1(a) and 1.162-7(a), Income Tax Regs. To be deductible, compensation may be "contingent" but it cannot be a "distribution of earnings of the enterprise." Sec. 1.162-7(a)(2), Income Tax Regs.[28] If the compensation is contingent, it must be paid pursuant to a "free bargain" entered into "before the services are rendered" and made solely to obtain the desired services on "fair and advantageous terms." Sec. 1.162-7(a)(2), Income Tax Regs.

Lastly, section 809(d)(3) permits a deduction for "dividends to policyholders."[29] "Dividends to policyholders" are "dividends and similar distributions to policyholders in their capacity as such" which are not "fixed in the contract" and which depend upon the "experience of the company." Sec. 811(a); sec. 1.811-2(a), Income Tax Regs.[30] However, this deduction is limited to the amount by which underwriting income (before the dividend deduction) exceeds investment income, plus $250,000. Sec. 809(f). Therefore, while dividends to policyholders may be deducted in full

---

[27]Sec. 162(a) provides:

SEC. 162(a). IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *

[28]Sec. 1.162-7(a)(2), Income Tax Regs., states:

The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. * * * If contingent compensation is paid pursuant to a free bargain * * * made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on a fair and advantageous terms the services * * * it should be allowed as a deduction * * *

[29]The amounts deducted by petitioner as "dividends to policyholders" consist solely of amounts attributable to ordinary life insurance policies which expressly provided for participating dividends and which were paid in accordance with a formula approved from time-to-time by resolutions of petitioner's board of directors. They are not at issue in this case.

[30]Sec. 1.811-2(a), Income Tax Regs., provides:

In general, any payment not fixed in the contract which is made with respect to a participating contract (that is, a contract which during the taxable year, contains a right to participate in the divisible surplus of the company) shall be treated as a dividend to policyholders. Similarly, any amount refunded or allowed as a rate credit with respect to either a participating or a nonparticipating contract shall be treated as a dividend to policyholders if such amount depends on the experience of the company * * *

against underwriting income, their deduction against investment income is limited to $250,000. See *Prairie States Life Insurance Co. v. United States,* 828 F.2d at 1225. Based on the operation of this limitation, respondent maintains that petitioner may deduct its retroactive rate credits only to the extent of $250,000 per year.

The definitions of "return premiums" and "dividends to policyholders" are mirror images of one another. Return premiums are amounts paid to policyholders which *are* fixed by the contract and *do not depend* on the experience or discretion of management, whereas dividends to policyholders are amounts paid to policyholders which *are not* fixed in the contract but *depend* on the experience or discretion of management. Congress allowed return premiums to be deducted in full because they represented redundant or excess premiums reflected in gross premiums already included in income. A full deduction was necessary to accurately reflect net premium income in the computation of taxable income. That symmetry is contrasted with dividends to policyholders which can be deducted in full against underwriting income but are limited in their capacity to reduce investment income. If Congress had provided for an unlimited deduction of dividends to policyholders, it would have enabled mutual insurance companies to avoid taxation on investment income altogether and thereby obtain a competitive advantage over stock companies. See discussion of legislative history in *American National Insurance Co. v. United States,* 690 F.2d at 880-883.

In contrast, what return premiums and dividends to policyholders have in common is that each must be amounts paid to *policyholders.* See secs. 809(c) and 811(a); *Prairie States Life Insurance Co. v. United States,* 828 F.2d at 1226. By definition, section 811(a) only includes dividends which are paid to policyholders. *Prairie States Life Insurance Co. v. United States, supra* at 1225-1226. Moreover, that statute requires that dividends be paid to policyholders "in their capacity as such." Sec. 811(a). Section 809(c)(1) clearly implies that return premiums must be paid to policyholders. The Eighth Circuit Court of Appeals discussed this implication in *Prairie States Life Insurance Co. v. United States, supra* at 1226 ("In this section, Congress

recognized that insurance companies may be contractually bound to make certain returns to policyholders.") as did the Court of Claims in *American National Insurance Co. v. United States, supra* at 883 (the return of "redundant" * * * premiums was a return of capital to the policyholder).

Consequently, before petitioner's retroactive rate credits are deductible either as dividends or return premiums, we must determine whether the accounts (to whom petitioner paid the retroactive rate credits) were "policyholders" as sections 809(c)(1) and 811(a) contemplate. If the accounts were not policyholders, the retroactive rate credits cannot be dividends (as respondent maintains) or return premiums (as petitioners contend).

The group policy, commission agreement, and retroactive rate credit agreement, all designate the account as "policyholder." We look, however, to the economic realities of a transaction not to the form employed by the parties, to determine tax consequences. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Houchins v. Commissioner*, 79 T.C. 570, 589-590 (1982). Labels, in and of themselves, are not controlling.[31] *Paula Construction Co. v. Commissioner*, 58 T.C. 1055, 1060 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). The substance of the transaction governs its treatment. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). See *Comdisco, Inc. v. United States*, 756 F.2d 569, 577-578 (7th Cir. 1985).

Using this approach, we find that the insureds, not the accounts, were the real "policyholders." The insureds decided whether to purchase petitioner's insurance based on their personal considerations. The accounts could not and did not require their insureds to purchase insurance from petitioner. Moreover, the insureds chose the particular

---

[31]Respondent maintains that we should consider only the written contracts, and he objects to our use of parol evidence in determining the character of the retroactive rate credits. However, in determining the economic realities of a transaction, we cannot confine ourselves to consideration of just written materials. *Estate of Craft v. Commissioner*, 68 T.C. 249, 260-263 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979), and the cases cited therein. Where we are concerned with substance not form, the determination is made from the facts surrounding the transaction, not the formal written documents executed by the parties. *Graphic Press, Inc. v. Commissioner*, 60 T.C. 674, 681 (1973), revd. on another issue 523 F.2d 585 (9th Cir. 1975).

insurance policy they purchased. If they were not satisfied with the rights provided in petitioner's policy, they could buy insurance from an independent source. Therefore, the accounts did not determine whether there would be any coverage, the type of coverage, or whether the coverage would be purchased from petitioner. This situation stands in sharp contrast to the usual group policy (i.e., employer-provided insurance) where the named policyholder determines whether there will be any coverage, the persons covered, the amount of coverage, and from whom coverage will be obtained.

Further, although the account was the primary beneficiary, petitioner relieved the insured or the insured's estate of the credit obligation in the event of the insured's death or disability. For example, if the insured purchased insurance covering an installment obligation arising from his purchase of an automobile, then, in the event of the insured's death during the term of the insurance, his estate could distribute the automobile free of any debt without reducing his estate's other assets. Consequently, in handling his estate, the insured determined the real beneficiary of the policy.

From the account's viewpoint, it based the decision whether to make the loan (which created the need for the insurance) on the general creditworthiness of the insured, not on the availability of insurance coverage. The account had to be satisfied that the insured would repay the loan because the more likely event was that the insured would outlive the term of the loan. Therefore, while the account's collection task was simplified in the event of the insured's untimely death, creditworthiness was the primary consideration in granting the loan.

Additionally, the insured paid the premium. The account invested none of its own funds; it acted merely as a conduit between the insured and petitioner. The statute describes return premiums as "amounts returned" to the policyholder and the legislative history makes clear that the amounts returned must be in the nature of redundant premiums. Sec. 809(c)(1); *American National Insurance Co.,* 690 F.2d at 883. Because the accounts expended none of their own funds to obtain insurance coverage, petitioner could not have "re-

turned" any premium to the account.[32] For this same reason, the retroactive rate credits could not be dividends. The account simply had no "investment" in the premium which could yield "dividends and similar distributions to policyholders in their capacity as such." Sec. 811(a).

Finally, the legislative history examined by the Court of Claims in *American National Insurance Co. v. United States,* 690 F.2d at 882-883, reveals that in allowing a full deduction of return premiums but only a limited deduction for dividends to policyholders, Congress designed these provisions to eliminate a competitive advantage mutual insurance companies might have over stock companies due to the taxability of the latter's investment income.[33] That competitive advantage would be the ability of the mutual company to offer greater benefits or lower premimums to prospective policyholders and thereby entice them to buy insurance from a mutual company rather than from a stock company. Since the insureds in this case decided whether or not to purchase coverage from petitioner, for the retroactive rate credits to influence their decision, those credits would have to be payable to them. Since petitioner's retroactive rate credits were never paid to the insureds, but were retained by the accounts, those credits did not serve the function ascribed by Congress to return premiums or to dividends to policyholders.

Petitioner designated the account as "policyholder" of the group policy so that petitioner did not have to issue an individual insurance policy to each insured, thereby reducing the paperwork. Petitioner possessed a good business

---

[32]See *Modern American Life Insurance Co. v. Commissioner,* 818 F.2d 1386 (8th Cir. 1987), revd. on other grounds T.C. Memo. 1985-629, wherein the Court interpreted the term "returned" in the context of ceding commissions under reinsurance agreements between insurance companies under sec. 809(c)(1). It found that, because a ceding commission paid by the reinsurer to the reinsured was the only payment made between the parties, that there was no premium income to be returned and, therefore, the ceding commission could not be "deemed a 'return' payment of any kind." *Modern American Life Insurance Co. v. Commissioner, supra* at 1391.

[33]This design was summarized by the Court of Claims as follows:

"The legislative history indicates that Congress distinguished between the deductibility of policyholder dividends and of return premiums because it believed that unlimited deductibility against phase I income of policyholder dividends would enable mutual insurance companies to avoid taxation on investment income and thereby to obtain a competitive advantage over stock companies. Congress did not perceive the same inherent danger in allowing other amounts returned to policyholders to be deducted without limitation against phase I income. There is no indication that Congress understood, or intended to create, any other relevant distinction between the two deductions. [690 F.2d at 882; citations omitted.]"

reason, therefore, for naming the account policyholder on the documents. However, that designation did not transform the account into a "policyholder" within the context of the statutory framework.

Respondent argues, however, that the account was the policyholder, not only because the policy named him as such but because he enjoyed certain rights traditionally accorded a policyholder. Respondent identifies the "right" of cancellation, the "right" to demand the use of certain mortality tables in calculating reserves and the right to receive the retroactive rate credits. However, because the insured prepaid the premium on each policy, the account's "right" to cancel the coverage was illusory. The insured purchased and paid for coverage which petitioner had to provide. In fact, even if the account terminated his relationship with petitioner, petitioner continued all coverage which the account had written for the entire term. Consequently, as a practical matter, only the insured could effectively cancel the policy and then only by prepaying his credit obligation. With regard to the "right" to demand the use of certain mortality tables, the record does not provide us with an evaluation of such right nor any evidence that any of the accounts ever exercised this right. Therefore, we have no basis on which to accord that factor much weight. Finally, the reason petitioner entitled the account to retroactive rate credits is the very question before this Court. Therefore, such right does not, in and of itself, support respondent's argument.

Most importantly, we are convinced that petitioner paid retroactive rate credits as compensation to accounts for services they performed in conjunction with selling and servicing petitioner's insurance and, therefore, they qualify as a deduction under section 809(d)(11). Petitioner recruited accounts. It bargained for their services in advance. To obtain those accounts who would be good producers, petitioner offered to pay them not only up-front commissions, but retroactive rate credits when they achieved certain levels of production. Since the accounts were not eligible for this compensation until they produced a minimum amount of premium, those accounts which could produce a substantial volume of premium income were

attracted to this arrangement. Moreover, the retention percentage decreased as volume increased, again an incentive for high-volume producers. This arrangement certainly fits the "free bargain" "made before the services are rendered" on "fair and advantageous terms" requirements of the regulations regarding contingent compensation. Sec. 1.162-7(a)(2), Income Tax Regs.

In generating the obligations which gave rise to the insurance, the accounts were already doing business with the persons having a need for petitioner's product, at the time when such need arose. Therefore, it was logical for petitioner to seek their services to sell its product. Moreover, in obtaining and processing the borrower's loan applications, the accounts possessed much of the information they needed to evaluate the borrower as an insurance risk. Therefore, the accounts were positioned naturally to solicit a prime group of prospects at little cost and with little effort. In fact, petitioner sought these relationships with the accounts for this purpose. Under their arrangement, petitioner could not incur any liability for retroactive rate credits without first paying commissions to the account.

The accounts also performed much of the paperwork traditionally performed by an insurance company providing insurance coverage. They were obligated to, and did, approve or deny applications by their borrowers for insurance (within certain policy limits) without further approval by petitioner. In addition, they calculated the premium, collected that premium from the borrower, computed the commissions due thereon, and forwarded the balance thereof to petitioner. They maintained records of certificate holders and collected claim information on forms provided by the petitioner. These additional services reinforce our conclusion that the retroactive rate credits were, in substance, compensation.

Finally, the regulations expressly state that the form or method of fixing compensation is not decisive of deductibility and that contingent compensation is acceptable when it, in fact, constitutes compensation and is not a disguised distribution of earnings. Sec. 1.162-7(a)(2), Income Tax Regs. As pointed out earlier, the formula set out in the

retroactive rate credit agreement encouraged volume production, a legitimate purpose for compensation. Moreover, petitioner's attempt to encourage accounts to ferret out good insurance risks by considering claims in calculating the amount of the account's retroactive rate credits under the particular group policy further evidences a reasonable business purpose for their arrangement.

Petitioner's accounting treatment of its retroactive rate credits is consistent with our finding. Petitioner represented its retroactive rate credits as "commissions to agents due or accrued" on its annual statement and as "commissions" in other reports. Petitioner included them in its deduction for commissions on its Federal income tax returns.

Respondent argues, however, that the commissions petitioner incurred under the commission agreements fully compensated the accounts for the services they rendered. He maintains that the retroactive rate credits were not commissions because State law in some States prohibited direct payment of "commissions" or "other compensation" to the accounts. See, e.g., Minn. Stat. Ann. sec. 60A.17, subdiv. 10 (West 1986). However, the way some States characterize retroactive rate credits does not control their deductibility for purposes of Federal income taxation. See *Commissioner v. Bollinger*, 485 U.S. ____ (Mar. 22, 1988). In addition, in States that limited compensation and specifically included retroactive rate credits as part of compensation, petitioner entered into only a commission agreement with the accounts.

Respondent relies on *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972) to support his State law argument. In that case, a holding company controlled several banks, a management company, an insurance agency, and an insurance company. The insurance company wrote credit insurance on persons making loans from the banks but did not pay the banks any commissions for originating the coverage. The respondent reallocated income to the banks under section 482 in the amount of the customary commission. The Supreme Court rejected the reallocation on the grounds that the banks did not receive any income *and* were prohibited by Federal banking laws from receiving it. Obviously, *First Security* is distinguish-

able from the instant case in several aspects. First, as contrasted with the banks who did not receive any income, petitioner actually paid the account's retroactive rate credits. Second, whether or not the accounts received these credits in violation of State law is not at issue here. Even if we should make such a determination, it would not affect our decision. Income received, legal or not, is fully taxable to its recipient. *James v. United States,* 366 U.S. 213 (1961). Third and most importantly, however, we are concerned not with the reallocation of income within a controlled group as was the Court in *First Security,* but with the deductibility of an expenditure. At no time has respondent argued that petitioner's retroactive rate credits are not deductible on the ground that they violated State law.

Respondent also cites Texas Attorney General Opinion No. 297A (1961) for the proposition that the account was a credit insurance policyholder, that it did not "sell" insurance and, therefore, that it is not required to be a licensed insurance agent. However, in this case, we have already found that the accounts sold petitioner's insurance to their borrowers and realized sizable commissions therefrom. Moreover, since respondent has allowed petitioner to deduct the amounts it paid to the accounts under the commission agreement as "commissions," it strikes us that he already has admitted that the accounts "sell" insurance.

Respondent correctly observes that in *American National Insurance Co. v. United States,* 231 Cl. Ct. 604, 690 F.2d 878 (1982), and in *Republic National Life Insurance Co. v. United States,* 594 F.2d 530 (5th Cir. 1979) (cases relied upon by petitioner), neither Court held that the amounts at issue were commissions. In *American National,* the Court decided whether "experience rating refunds" that the taxpayer was contractually obliged to pay certain of its policyholders constituted "return premiums" or "dividends to policyholders." The Court decided that they were return premiums. Since neither party in *American National* argued that the refunds constituted commissions, the Court never considered that issue. Nor was the commission issue raised in *Republic National,* where the Fifth Circuit decided that certain "premium refunds" constituted return premiums. We have considered the opinions in *American National* and

*Republic National,* and we find nothing in either opinion that would preclude or cast doubt on our holding in this case.

Moreover, in *American National* and *Republic National,* the Courts found that the amounts in issue constituted "return premiums" fully deductible by the taxpayers. After trying the issue in this case, we have determined that petitioner's retroactive rate credits are properly characterized as "commissions." The practical effect of *American National, Republic National,* and this case is identical: both return premiums and commissions are fully deductible by life insurance companies. Only a holding that the retroactive rate credits constituted dividends to policyholders would result in the limited deduction sought by respondent.

To summarize, we find that the accounts were not "policyholders" within the contemplation of section 809(d)(3) because (1) the borrowers controlled the origination of and, for all practical purposes, the termination of the insurance; (2) the burdens and benefits of the insurance accrued to the borrowers; and (3) the accounts paid no premiums with their own funds. Therefore, no amount could be "returned" as "return premiums" or invested to produce "dividends" to policyholders. Further, the accounts performed sales and administrative functions for which they received compensation in the form of commissions and retroactive rate credits (retrospective commissions). A deduction for compensation is clearly allowable under section 162 and therefore deductible under section 809(d)(11).

## Retroactive Rate Credit Reserve

The total amount of the retroactive rate credits petitioner deducted as "commissions" on its Federal income tax returns consisted of amounts it paid the accounts under the retroactive rate credit agreements and adjustments for changes in its retroactive rate credit reserve (hereinafter sometimes referred to as the reserve). In other words, the amount of the commission deduction attributable to retroactive rate credits equaled the total retroactive rate credits actually paid through the end of each account's contract year, less the reserve balance at the beginning of the year, plus the reserve balance at the end of the year.

In the notice of deficiency, respondent determined that petitioner could deduct amounts actually paid under the retroactive rate credit agreements but not the retroactive rate credit reserve. Accordingly, he eliminated changes in the reserve from the computation of petitioner's deduction for retroactive rate credits. Petitioner contends that inclusion of the reserve is a proper method of accounting and, therefore, that respondent's adjustment is unwarranted.

Section 818 provides, in general, that life insurance companies must report their income and deductions using the accrual method of accounting. In addition, and to the extent possible, such accounting method should be consistent with that required by the NAIC.[34] NAIC accounting must be followed unless the rules of accrual accounting dictate a contrary result. *Commissioner v. Standard Life & Accident Insurance Co.,* 433 U.S. 148 (1977). Thus, if accrual accounting does not address the treatment of an item, Congress has adopted NAIC accounting methods to prescribe the proper treatment of the item for tax accounting purposes. On the other hand, if accrual accounting and the NAIC method both directly address the treatment of the same item, accrual accounting controls. *Time Insurance Co. v. Commissioner,* 86 T.C. 298, 326 (1986).[35]

Petitioner argues that since the reserve is calculated in the manner required by the NAIC, changes in the reserve must be taken into consideration for the proper calculation of its commission deductions. However, unless a reserve is specifically authorized, no deduction will be allowed for amounts contained therein, the liability for which is contingent and not fixed by the end of the accounting period. *World Airways, Inc. v. Commissioner,* 62 T.C. 786, 801

---

[34]SEC. 818. ACCOUNTING PROVISIONS.

(a) METHOD OF ACCOUNTING.—All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter [i.e., chapter 1, relating to normal taxes and surtaxes](other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

[35]See also *Western Casualty & Surety Co. v. Commissioner,* 65 T.C. 897 (1976), affd. 571 F.2d 514 (10th Cir. 1978); *City Investing Co. v. Commissioner,* T.C. Memo. 1987-36, on appeal (2d Cir., Nov. 16, 1988).

(1974), affd. 564 F.2d 886 (9th Cir. 1977). In evaluating the reserve at issue, we must distinguish it from those reserves which are peculiar to the insurance industry (hereinafter, insurance-type reserves). Insurance-type reserves are those that are necessary to account properly for the amount of premium income which will be recognized during the taxable year and that provide for losses which are expected to result from the risk attendant to that premium income (i.e., the risk that the insured will become sick or die during the term of the insurance). These reserves generally are deductible under sections 809(d)(1) and 809(d)(2) and are defined in section 810(c). Insurance-type reserves are necessary to avoid taxing premiums before they are earned and to assure the ultimate payment of claims; therefore, they are necessarily the prime concern of the NAIC and to a large degree determine that body's reporting standards.

In *Bituminous Casualty Corp. v. Commissioner*, 57 T.C. 58, 77-78 (1971), we identified the reasons for the deference to the NAIC in certain matters of insurance accounting.

The nature of  * * *  insurance requires accounting rules substantially different from the accounting rules applicable to general commerce.

In commerce generally, expenses come first and income follows. The manufacturer must incur the cost of manufacturing his product before he gets paid for it. The merchant must purchase his inventory before he can resell it.

In the insurance industry, however, the reverse is true. The policyholder pays the insurance company in advance and the insurance company's costs, which are primarily the payment of claims, come afterwards. If the premiums were to be taxed as received and the deductions allowed only as they later became fixed, the result would be to tax very large sums of money as income when in fact those amounts will never really become income because they will have to be paid out to policyholders and other claimants.

* * * * * * *

The Annual Statement method of accounting relies extensively on the use of estimated amounts which would be improper under general tax accounting. Thus, for example, instead of taking into income all of the premiums received or accrued,  * * *  insurance companies take into account only the portion of those premiums which are estimated to be "earned." Similarly, the major deductions from income are "losses" and "loss adjustment expenses," which are again estimated amounts. The deduction of these loss and loss adjustment expense items is fundamentally at odds with the "all events" test: The items include amounts for liabilities which are not established, but, on the contrary, vigorously

contested; they include, in the case of the loss adjustment items, expenses which will not only be paid in the future, but which are attributable to events which will not even occur until the future * * * .

Petitioners herein do not contend that the Annual Statement method of accounting is controlling in every respect for tax purposes. However, the Internal Revenue Code clearly adopts the basic approach of the Annual Statement method in computing underwriting income and that basic approach, *so far as it concerns income from premiums and losses from claims,* is inconsistent with tax accrual rules applicable to commerce generally."[36] [Emphasis added.]

Petitioner's reserve for retroactive rate credits does not pertain to the recognition of either premium income or the losses related thereto. Rather, the reserve simply reflects commissions the payment of which are contingent upon certain performance results. The accrual of contingent commissions is not unique to the life insurance industry. Many businesses pay commissions based on their net profits after they realize those profits and determine the amount thereof. The record does not show nor can we envision any valid reason why contingent commissions of a life insurance company should be treated differently for tax purposes from contingent commissions of any other type of business using the accrual method of accounting.[37] Moreover, commissions are deductible by life insurance companies by way of section 809(d)(11). That section refers us to section 162, which allows a deduction for "expenses paid or incurred during the taxable year in *carrying on any trade or business.*" Therefore, we will apply general accrual accounting rules to petitioner's retroactive rate credit reserve to determine whether and to what extent petitioner may deduct the reserve.

---

[36]In *Bituminous Casualty Corp. v. Commissioner,* 57 T.C. 58 (1971), the taxpayer was a casualty insurance company taxed under the provisions of sec. 831 et seq. However, the above discussion applies equally to the life insurance industry. See *Time Insurance Co. v. Commissioner,* 86 T.C. 298, 319-320 (1986).

[37]We applied this principle in *City Investing Co. v. Commissioner,* T.C. Memo. 1986-36, on appeal (2d Cir., Nov. 16, 1988), where we found that one of the taxpayer's subsidiaries, which was a property and casualty insurance company, was required to meet the timing requirements as well as all other requirements of sec. 162(a) when deducting commissions under sec. 832(c)(1) in the same manner as any other taxpayer under an accrual method of tax accounting. We stated that "It seems clear that Congress did not intend that this deduction [for commissions], which is not unique to the insurance industry or separately provided for in subchapter L, to be treated differently from other taxpayers subject to the Internal Revenue Code."

Accrual accounting seeks to match income earned with expenses attributable to earning that income in the same accounting period. *United States v. Anderson,* 269 U.S. 422, 440 (1926). Since revenues are not necessarily received in the same accounting period in which the related expenses are paid, accurate matching of expenses against revenues generally is accomplished either by "deferring" receipts until such time as the related expenses are incurred or by "accruing" estimated future expenses so as to offset current revenue.[38] *Mooney Aircraft, Inc. v. United States,* 420 F.2d 400, 403 (5th Cir. 1969). However, for tax purposes, these rules have been modified on both the income side and the expense side of the ledger.[39] On the expense side, an expense may be deducted only in the taxable year in which it is properly "accruable" for tax purposes. Sec. 461(a).[40]

Section 1.461-1(a)(2), Income Tax Regs., sets forth the rule for determining the proper year for an expense accrual. It provides that:

Under an accrual method of accounting, an expense *is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy.* * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * * [Emphasis added.]

Thus, there are two requirements an item of expense must satisfy to be properly accruable: (1) That all events necessary to "fix" liability for the expense have occurred, and (2) that the amount of the expense is ascertainable with reasonable accuracy (hereinafter all-events test). *United States v. Hughes Properties, Inc.,* 476 U.S. 593 (1986). The requirement that a taxpayer establish the fact of liability is

---

[38]This "matching" principle has been recognized with regard to life insurance companies. See *North American Life & Casualty Co. v. Commissioner,* 533 F.2d 1046 (8th Cir. 1976), affg. 63 T.C. 364 (1974).

[39]The Commissioner espoused these modifications pursuant to his power to disallow methods of accounting which do not clearly reflect income. Sec. 446; *World Airways, Inc., v. Commissioner,* 62 T.C. 786, 799 (1974), affd. 564 F.2d 886 (9th Cir. 1977).

[40]SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) GENERAL RULE.—The amount of any deduction or credit allowed by this subtitle [i.e., subtitle A, relating to income taxes] shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

designed to prevent deductions for expenditures that might never occur. *Burnham Corp. v. Commissioner,* 90 T.C. 953, 955 (1988). As a general rule, therefore, the existence of a contingency in the taxable year with respect to a liability or its enforcement prevents accrual. *Trinity Construction Co. v. United States,* 424 F.2d 302, 305 (5th Cir. 1970); *World Airways, Inc. v. Commissioner,* 62 T.C. 786, 804 (1974), affd. 564 F.2d 886 (9th Cir. 1977). Delay in payment, however, does not change the fact of liability. *Lawyer's Title Guaranty Fund v. United States,* 508 F.2d 1, 6 (5th Cir. 1975). In addition, the Requirement That a taxpayer establish the amount of liability with reasonable accuracy is designed to avoid excessive deductions or fixed liabilities the amounts of which cannot be reasably determined. *Burnham Corp. v. Commissioner, supra* at 958. Both requirements must be satisfied in order to properly accrue the liability. *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497, 634 (1980).

After consideration of the record in this case, we find that petitioner's retroactive rate credit reserve does not meet the all-events test for deduction of an expense. We have no quarrel with the deduction of retroactive rate credits which petitioner calculated at the end of each account's contract year whether paid or unpaid. The reserve, however, reflects retroactive rate credits both "earned" for a period which begins with the end of the various contract years of each account and ends with December 31, and "unearned" on January 1 (the day after the end of the taxable year) and ending on those various dates on which the individual certificates would expire.

We can dispose of the "unearned" portion of the reserve rather quickly. It is composed of estimated retroactive rate credits which petitioner might owe in the future, based on premiums petitioner had not yet taken into income.[41]

---

[41]Although the premium for the entire term of the policy is collected from the borrower at the time the insurance is sold, petitioner does not recognize the entire premium as income when it is received. As explained in petitioner's accountant's report (Joint Exhibit 33AD):

"Credit life insurance premiums are recognized as earned revenues ratably over the coverage period of each policy, averaging approximately 30 months. Substantially all of the unearned premiums * * * are calculated on the sum of the months method and represent the unexpired portion of premiums.

"Credit accident and health insurance premiums and policy reserves:

Petitioner calculated this portion of the reserve by taking into consideration an estimated amount of claims for which the underlying events had not yet occurred. Because the unearned portion of the reserve provided for commissions on premiums not yet taken into income, petitioner failed to match income with expenses. Rather, petitioner deferred its recognition of premium income which it had already received and deducted commissions which might become payable thereon. Clearly, this procedure did not properly reflect income. Therefore, respondent's disallowance was warranted.

With regard to the "earned" portion of the reserve, however, petitioner's contention is not so easily dismissed. Petitioner correctly points out that premiums earned through December 31 of each year were included in its income as of the end of its taxable year. Consequently, to match income earned with expenses, all properly accruable expenses relating to such income should be taken into account.

However, the earned portion of petitioner's reserve does not pass the all-events test. First, an account had to produce a minimum net written premium (usually $5,000) during a contract year *before* it was eligible to receive any retroactive rate credits. Whether this minimum would be met may not have been ascertained for some accounts until after December 31. With respect to these accounts, therefore, it was impossible at December 31 to know whether petitioner would ever have any liability. Therefore, with respect to that portion of the reserve attributable to these accounts, petitioner failed the first prong of the all-events test. *Peoples Bank & Trust Co. v. Commissioner*, 50 T.C. 750, 755 (1968), affd. 415 F.2d 1341 (7th Cir. 1969) ("At [December 31] not only the amount of liability but the very existence of liability was indefinite and unascertained."); see also *Bennett Paper Corp. & Subsidiaries v. Commissioner*, 699 F.2d 450 (8th Cir. 1983), affg. 78 T.C. 458 (1982); *World Airways, Inc. v. Commissioner, supra.*

---

"Insurance premiums are recognized as earned revenues ratably over the terms of the policies. Unearned premiums * * * are calculated on the monthly pro-rata basis and represent the unexpired portion of premiums."

Second, claims for which the underlying events had not yet occurred at December 31 (the death or disability of an insured after December 31 but before the forthcoming end of each contract year) affected petitioner's liability for retroactive rate credits to any particular account. Because many claims were substantial when compared with the account's potential retroactive rate credit, these claims could easily prevent petitioner's contingent liability to that account from maturing into a liability in fact.[42] Since liability, if any, to these accounts could not be determined at December 31, no liability had in fact "accrued" at the end of petitioner's taxable year.[43] *Peoples Bank & Trust Co. v. Commissioner, supra.* Therefore, with respect to that portion of the reserve attributable to these accounts, petitioner again failed the first prong of the all-events test.

Third, petitioner failed the first prong of the all-events test because the amount of petitioner's total liability for retroactive rate credits depended on the distribution of claims among accounts. All other variables being equal, petitioner would be liable for a smaller aggregate amount of retroactive rate credits if a disproportionately large number of claims were made by insureds of an account with a positive balance rather than by insureds of an account with a negative balance. This disparity was caused by the fact that claims made by the insureds of an account with a positive balance currently reduced petitioner's overall liability for retroactive rate credits dollar-for-dollar, whereas claims made by insureds of an account with a negative position would not reduce petitioner's current liability at all. Therefore, not only the number and size of claims but the *distribution of such claims among the various accounts* would, after December 31, affect the amount of the liability actually incurred. Since the distribution of claims was not

---

[42]Based on an average coverage of $2,660, an average combined premium of $110 and an average retroactive rate credit of 4 percent of premium, one loss of $2,660 would wipe out the retroactive rate credits attributable to approximately 600 insureds ($2,660 ÷ ($110 × 4 percent)).

[43]These circumstances are analogous to those in *Peoples Bank & Trust Co. v. Commissioner*, 50 T.C. 750 (1968), affd. 415 F.2d 1341 (7th Cir. 1969), where we held that a bank could not deduct an interest reserve for "accrued interest" on certain accounts as of Dec. 31 because no liability arose until May of the following year. See also *Bennett Paper Corp. & Subsidiaries v. Commissioner*, 699 F.2d 450, 453 (1983), affg. 78 T.C. 458 (1982).

established until after petitioner's taxable year, liability was not "fixed" at December 31.

Fourth, petitioner's failure to take contingency reserves and negative unearned reserves into consideration when it calculated the "earned" portion of the reserve was inconsistent with the liability it incurred under the retroactive rate credit agreement, resulting in consistently overstating the amount of the commission deduction. Petitioner's overstatement of the reserve precludes our finding that the amount of the reserve was reasonable.

Petitioner's provision for a contingency reserve in the retroactive rate credit agreement operated to slow payment of the retroactive rate credits to the account. Therefore, the amount in the reserve at December 31 was greater than the liability under the agreement at that date. Moreover, use of a contingency reserve exposed the deferred credits to further dissipation by claims on insurance written after December 31, thereby actually reducing petitioner's ultimate liability for retroactive rate credits.

The amount of the reserve could not be determined with reasonable accuracy in one other respect. Until petitioner knew what a particular account's total annual net premium earned was, it could not ascertain the proper retention percentage, which varied with the volume of premium the account produced in each contract year. Without being able to ascertain the retention percentage, petitioner could not determine with reasonable accuracy the amount of its liability for future retroactive rate credits applicable to the period starting with the account's contract year and ending on December 31.

Petitioner argues, however, that reserves similar to its retroactive rate credit reserve consistently have been allowed as deductions by various Courts. It cites in support thereof *Lincoln National Life Insurance Co. v. United States,* 217 Ct. Cl. 515, 582 F.2d 579 per curiam (1978); *Time Insurance Co. v. Commissioner,* 86 T.C. 298 (1986); and *Bituminous Casualty Corp. v. Commissioner,* 57 T.C. 58 (1971). However, as indicated in our previous discussion of insurance-type reserves, the mere fact that an account is labeled a "reserve" does not make it deductible. We must carefully compare petitioner's reserve with the reserve

involved in each of the cited cases to see if any of the later reserves are substantially similar in nature and manner of computation.

In *Lincoln National Life Insurance Co. v. United States, supra,* the parties stipulated that the retrospective group refund at issue in that case was deductible as a dividend to its policyholders. Therefore, the Court based its analysis on section 1.811-2(c)(1)(ii), Income Tax Regs., which specifically permitted an insurance company to deduct dividends to policyholders which were fixed by a formula and which were not subject to change by the company. The Court decided that a deduction was allowable (even though such dividends to policyholders were subject to certain contingencies) because "Congress, in respect of reserves *for dividends on individual policies,* adopted the industry practice of ignoring such future contingencies beyond the company's control so that the 'all-events' test does not apply to dividend reserves for such policies." *Lincoln National Life Insurance Co. v. United States,* 582 F.2d at 601 (emphasis added).

In *Bituminous Casualty Corp. v. Commissioner, supra,* the Court was faced with the deductibility of a reserve which consisted of the taxpayer's estimate of premiums to be refunded to the policyholder on workman's compensation policies, net of additional premiums to be collected on such policies, based upon the policyholder's volume of premiums and past loss experience. The premium adjustment could be made anytime from six months to a number of years after the end of the policy term. The Court found that the reserve constituted an "unearned premium" reserve and allowed its deduction based on a regulation specifically adopting the allowance of such premium credits in the computation of unearned premium reserves. *Bituminous Casualty Corp. v. Commissioner,* 57 T.C. at 81-82.

Similarly, in *Time Insurance Co. v. Commissioner, supra,* the issue involved was whether the taxpayer could deduct claim reserves established for medical reimbursement policies under sections 809(d)(1) and 809(d)(2). The regulations under these sections allow the deduction of: "a reasonable estimate of the amount of the losses * * * incurred but not reported by the end of the taxable year." Sec. 1.809-5(a)(1), Income Tax Regs. The Court recognized that:

> The general rules of accrual accounting and the applicable sections of the Code and regulations are silent with regard to the question of the method for determining the reserves under consideration in this case. However, the NAIC form and its accompanying instructions contain detailed specifications as to how the reserves are to be calculated. [86 T.C. at 326.]

Having found that the taxpayer's reserve conformed to NAIC requirements, the Court upheld the deduction.

Petitioner's retroactive rate credit reserve, however, is not comprised of dividends to policyholders, deductible under section 811, as involved in *Lincoln National Life Insurance Co. v. Commissioner, supra;* nor unearned premiums, defined in section 832(b)(4), as involved in *Bituminous Casualty Corp. v. Commissioner, supra;* nor claim reserves deductible under sections 809(d)(1) and 809(d)(2) as involved in *Time Insurance Co. v. Commissioner, supra.* Rather, petitioner has convinced us and we have held that its retroactive rate credits are, in fact, commissions. The deduction of commissions is not unique to the insurance industry or separately provided for in subchapter L.[44] Moreover, accrual accounting and section 1.461-1(a)(2) of the regulations apply to the issue of accruing commissions. Therefore, we specifically adopt the all-events test in evaluating petitioner's use of this reserve. We find that petitioner's retroactive rate credit reserve fails the all-events test and, therefore, is not a proper accrual of a deduction.

Petitioner also cites *North American Life & Casualty Co. v. Commissioner,* 533 F.2d 1046 (8th Cir. 1976), affg. 63 T.C. 364 (1974), as authority for the proposition that the Courts have allowed the deduction of a liability for commissions that does not meet the requirements of the all-events test. However, in that case, the Court was faced with deciding whether commissions were deductible in light of the fact that the deferred and uncollected premiums upon which they were payable had been taken into income. The Court refused to allow the Commissioner "to disregard the traditional accrual principles in requiring deferred premiums to be included in taxpayer's income while also contending that adherence to such principles is required to deny

---

[44]*City Investing Co. v. Commissioner,* T.C. Memo. 1987-36, on appeal (2d Cir., Nov. 16, 1988).

taxpayer a deduction for commission expenses directly tied to the same income." 533 F.2d at 1052.

The North American Life issue was later considered by the Supreme Court in *Commissioner v. Standard Life & Accident Insurance Co.*, 433 U.S. 148 (1977), where the Court was presented with four different approaches to the problem of including the fictional assumption that deferred and uncollected premiums should be taken into income. It adopted the NAIC approach of taking only the net valuation portion of premium into income, and thereby rejected making additional fictional assumptions as to the deductibility of expenses (including salesman's commissions) that did not meet the all-events test.

Beyond the basic premise that expenses should be matched with related income, these cases simply do not apply to the case at hand. We are not here concerned with a fictitious assumption as to deferred and uncollected premium income. The credit insurance premiums at issue here were all bona fide, collected premiums. Moreover, the allocation between the earned and unearned portions of that premium income is not in issue here. We assume that petitioner has properly reported the portion of the premium it collected that is includable in its gross income, as respondent has not questioned petitioner's method for determining the recognized portion of the premium. Rather, the issue here is whether at the end of each calendar year petitioner properly accrued commissions for which it was in fact liable in an amount that could be reasonably determined. We find that petitioner's reserve does not meet those criteria. Accordingly, we hold that petitioner may not take into account changes in its retroactive rate credit reserve for purposes of computing its commission deduction.

## Change in Accounting Method

The final issue for our decision is whether respondent's determination—that petitioner may not take into consideration changes in its retroactive rate credit reserve in computing its commission deduction—constitutes a change in method of accounting within the meaning of section 481. If it does, section 481 requires certain adjustments to

petitioner's income to prevent amounts from being either duplicated or omitted from the computation of taxable income as a result of the change.[45] The Commissioner is authorized to change a taxpayer's method of accounting when it does not clearly reflect income. *Electric & Neon, Inc. v. Commissioner,* 56 T.C. 1324, 1333 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). However, when the Commissioner requires the change, he may not take adjustments relating to pre-1954 years into account. Sec. 481(a)(2); *Peoples Bank & Trust Co. v. Commissioner,* 50 T.C. 750, 754 (1968), affd. 415 F.2d 1341 (7th Cir. 1969).

Section 481 applies to not only a change in the taxpayer's overall method of accounting, but also to a change in the treatment of a "material item." Sec. 1.481-1(a)(1), Income Tax Regs. However, a change in method of accounting does not include an adjustment of any item of income or deduction "which does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.[46] Petitioner contends that the disallowance of the reserve does not affect the timing of a deduction but, rather, represents the disallowance of an improper deduction citing *Schuster's Express, Inc. v. Commissioner,* 66 T.C. 588, 594 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977); see also *Copy Data, Inc. v. Commissioner,* 91 T.C. 26 (1988).

Essentially, this is the same argument made by the taxpayer in *Knight-Ridder Newspapers v. United States,* 743 F.2d 781, 797 (11th Cir. 1984). In that case, the taxpayer was a newspaper which charged its advertisers a lower per-line rate after their annual volume exceeded a certain level. After reaching that level, the advertisers were

---

[45]Sec. 481 provides:

SEC. 481(a). GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

[46]Sec. 1.481-1(a)(1), Income Tax Regs., incorporates the rules of sec. 446(e) and sec. 1.446-1(e), Income Tax Regs.

entitled to a rebate. The taxpayer established a reserve at the end of its taxable year to reflect anticipated advertising rebates, took deductions for additions to the reserve, and reduced the reserve when it paid the rebates. The taxpayer argued that the reserve was overstated, that the excess amount was an improper deduction which might never be expended, and that, therefore, the reserve did not involve the timing of a deduction.

The court rejected the taxpayer's argument, reasoning that:

The reserve method determines when income will be taxed. When deductions are taken early (at the time [additions are made] to the reserve), an equal amount of income is obviously not taxed. That income is taxed, however, at the later time when deductions would have been taken under a different system (i.e., at the time rebates are paid, the absence of deductions means that an equal amount of income is taxed). Most important, at the time the company ceases to use the reserve (e.g., when the company closes out its business), any remaining balance in the reserve must be included in taxable income. * * * Thus, no income is avoided altogether. Any excess deductions in earlier years are offset by an equal amount of taxable income in the final day. The question becomes one of timing, whether income is taxed when the amounts are added to the reserve or when the reserve is abandoned at the Day of Armageddon * * * [743 F.2d at 799.]

Here too, petitioner reduced its income earlier than was proper by accruing retroactive rate credits which had not matured sufficiently to meet the all-events test. This method of accounting allowed a deduction for retroactive rate credits in the year they were added to the reserve, and in effect, eliminated that deduction in the year in which they were properly accruable. We have already decided that petitioner's retroactive rate credits are fully deductible as commissions; the reserve does not change that. The reserve affected only the year in which the deduction was claimed. Consequently, we find that respondent's disallowance of petitioner's reserve for retroactive rate credits constitutes a change in method of accounting. Accordingly, we hold that respondent's section 481 adjustment with regard to petitioner's reserve for retroactive rate credits is proper.

*Decision will be entered under Rule 155.*